Timothy F. Butler, Esq.
David J. McCarthy, Esq. *Of Counsel*
TIBBETTS, KEATING & BUTLER, LLC
Attorneys for Plaintiffs Eric Blattman,
   individually and as assignee, Lamb
   Family LLC and David Staudinger
9 West 45th Street, Ninth Floor
New York, NY 10017
(212) 629-4119
(212) 615-2215 (Fax)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

| | |
|---|---|
| ERIC BLATTMAN, *individually and as an assignee of certain former members of E2.0, LLC,* Lamb Family LLC, and David Staudinger, | **AMENDED COMPLAINT** 14 civ. 8588 (KBF) |
| Plaintiffs, | |
| - against - | **Plaintiffs request a jury trial** |
| THOMAS M. SIEBEL, DAVID SCHMAIER, JOHN DOE 1, and JANE DOE 2 | |
| Defendants. | |

-------------------------------------------------------------------------x

Plaintiff Eric Blattman, individually and as an assignee of certain former Unitholders of

Efficiency 2.0, LLC ("E2.0"), and plaintiffs Lamb Family LLC and David Staudinger, by and

through their attorneys, Tibbetts, Keating & Butler, LLC, as and for their complaint, allege:

## PARTIES

1.      Eric Blattman ("Blattman"), an individual who resides in the State of

Connecticut, until on or about May 1, 2012, held approximately a 30 percent ownership interest

in E2.0.   Together with Blattman, there were 30 Unitholders who collectively owned all of the

issued and outstanding membership interests ("Units") of E2.0.  Blattman is appearing as a

plaintiff in his individual capacity and, pursuant to separate agreements, as assignee of each of 19 former E2.0 Unitholders, which assignees, until on or about May 1, 2012, held approximately a 32 percent ownership interest in E2.0.  The E2.0 Unitholder assignees reside in the states of Connecticut, Florida, Maryland, New Jersey, and New York.  Plaintiff Eric Blattman, each of the E2.0 Unitholder assignees, and plaintiffs Lamb Family LLC and David Staudinger, are collectively referred to hereinafter as the "E2.0 Unitholders."

2.      Lamb Family LLC is a limited liability company organized under the laws of the State of Illinois which held until on or about May 1, 2012 approximately a 0.5% percent ownership interest in E2.0.

3.      David Staudinger, an individual who resides in the State of New York, held until on or about May 1, 2012 approximately a 1% percent ownership interest in E2.0.

4.      Upon information and belief, defendant Thomas M. Siebel ("Siebel") is an individual who resides in the State of California.  He was the Chief Executive Officer and majority owner of C3, LLC, a Delaware limited liability company, and is Chairman and Chief Executive Officer of C3, Inc., a corporation organized under the laws of the State of Delaware, and the successor to C3, LLC (collectively, "C3").

5.      Upon information and belief, defendant David Schmaier ("Schmaier") is an individual who resides in the State of California.  At all relevant times Schmaier represented and held himself out as the Chief Operating Officer of C3 and he was a holder of a significant minority interest in C3, LLC.  In addition, at all relevant times referred to below, Siebel vested in Schmaier the responsibility of negotiating with the E2.0 Unitholders a merger of E2.0 with a wholly-owned subsidiary of C3.

6.      C3, a non-party, is an unnamed co-conspirator of the defendants in the fraudulent scheme described below.

## JURISDICTION AND VENUE

7.      Plaintiffs assert a claim under 15 U.S.C. § 78j (b) and 17 Code of Federal Regulations § 240.10b-5, over which this court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Plaintiffs also assert a state law fraud claim and a state law breach of contract claim over which this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1331, because there exists complete diversity of citizenship between the plaintiffs and the defendants and the amount in controversy exceeds $75,000.  Alternatively, this Court has supplemental jurisdiction with respect to the state law claims pursuant to 28 U.S.C. 1367.

8.      Venue is appropriate in this District under 28 U.S.C. § 1391(b) (2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## NATURE OF THE ACTION

9.      This action arises out of defendants' fraudulent scheme to cause C3 to acquire plaintiffs' interest in E2.0.  The scheme involved a Merger Agreement whereby plaintiffs delivered their E2.0 shares to C3 in exchange for: (i) the satisfaction of $1.25 million of E2.0 debt, (ii) C3 Units purportedly worth $23.75 million, and (iii) additional C3 Units purportedly worth $25,000,000 pursuant to an Earn Out provision.  C3 through its fraudulent conduct acquired the E2.0 shares for consideration on the day of the closing that was worth only a small fraction of $25,000,000, and deprived E2.0 Unitholders of any opportunity to collect under the Earn Out provision any of the additional C3 Units purportedly worth up to $25,000,000.

10.      Central to defendants' fraudulent scheme were: (i) defendants' representations and omissions regarding the value of C3 and the C3 Units delivered to plaintiffs, and the

attributes of  C3's business, market, product and customer relations which purportedly supported a $500 million valuation of C3, and (ii) defendants' "Earn Out" representations and omissions regarding defendants' purported commitment to cause C3 to fund an agreed expansion in the operations of the E2.0 Business Unit during the three year Earn Out period, together with representations and omissions regarding the former E2.0 management and staff being allowed to continue to operate the E2.0 Business Unit as a stand-alone business from their New York offices during that three year period pursuant to a three year budget approved by defendants.

11.     These representations and omissions, which were made to, or concealed from, plaintiffs in order to induce plaintiffs to exchange their E2.0 Units for shares of C3, were false or materially misleading at the time of the representations and omissions, and were known to be so. Plaintiffs relied upon the representations and the omissions in surrendering their E2.0 Units in exchange for C3 shares.

12.     After the Merger Agreement was executed on May 1, 2012, Siebel initiated what would be a seven month campaign to cause C3 to assume control over all communications with the former customers of E2.0 and to dismantle, and then shut down, the operations of the post-merger E2.0 Business Unit.  Defendants, contrary to their representations to plaintiffs during the Merger negotiations, terminated all of the former officers and employees of E2.0 who had been hired to run the E2.0 Business Unit as a stand-alone business for the three year Earn Out period, shut the New York office on November 29, 2012, and transferred management of the former E2.0 operations to C3's employees in California.

**History of E2.0**

13.     E2.0 was a high tech start-up company engaged in the business of providing energy efficiency software and program services for use by utilities initially with their residential

4

customers and later with their small to medium business ("SMB") customers.  E2.0, formerly known as Climate Culture, LLC, was organized and formed in March 2007.  Thomas Scaramellino ("Scaramellino") devised the initial idea for the business while he was in law school.  Scaramellino engaged the assistance of Ezekiel Hausfather, another graduate student, to develop the initial analytics of the company, and then later engaged others to engineer a company product.

14.     By 2008, E2.0 was being managed by a group of four young, motivated entrepreneurs.  They were hands-on in operating the company.  They were also asked to speak and publish at many different events in the energy efficiency industry.

15.     E2.0 maintained its place of business in the City and State of New York.

16.     In September 2008, the company launched a web application that was designed to foster cooperation among consumers and corporations to reduce activities that exacerbate global warming.  In November 2008, the company, together with another company called SmartPower, launched and administered a contest called "America's Greenest Campus" which was designed to encourage college organizations to reduce the carbon footprint of, and improve energy efficiency at, their respective colleges.  The web program developed by E2.0 for use in the "America's Greenest Campus" contest provided personal energy saving recommendations and tracked the progress of each individual college, as well as the energy savings collectively achieved by the students in the 465 colleges which participated.  The United States Department of Environmental Protection awarded E2.0 a Clean Air Excellence Award for the "America's Greenest Campus" program.

17.     In January 2009, Climate Culture changed its name to Efficiency 2.0, LLC.  At that time E2.0 had seven full time employees who were creating software and marketing

products and services that electric and gas utilities could use to assist their residential customers in reducing their energy usage.  E2.0 invested substantial resources from its inception in achieving regulatory and utility approval for its novel approach to generating and measuring verified energy savings through an opt-in, online engagement strategy that leveraged a utility's residential customers.  In 2009, under its first two contracts, E2.0 launched two websites for the Citizen's Utility Board in Chicago (cubeenergysaver.com) and Western Mass Electric (westernmasssaves.com) with respect to energy savings by residential utility consumers.

18.     In 2010, E2.0 generated revenues of $207,000 through its energy savings contracts.  In that same year, E2.0 developed a product for utility companies to use with their small-to-medium business ("SMB") customers to generate energy savings, and began submitting responses to requests by utility companies for bids for contracts to generate energy savings with SMB consumers.

19.     In January 2011, a governmental agency named Chicago Metropolitan Agency for Planning awarded a third energy savings contract to E2.0.  That contract provided for revenues in excess of $1 million.  In 2011, E2.0 generated revenues totaling $1.1 million, a five-fold increase over one year.

20.     By 2011, E2.0 had become the first company to demonstrate verifiable energy savings achieved through an opt-in, online engagement by a utility's residential customers.

21.     In August 2011, a Stanford University Professor wrote a highly favorable evaluation of one of E2.0's energy saving programs in the residential utility market and talked about E2.0's program in industry conferences.

22.     In the last quarter of 2011 and the first quarter of 2012, E2.0 signed up five more utility customers to contracts with total additional revenues of approximately $5 million,

including E2.0's first contract for a utility's SMB consumers.  E2.0 expected it would generate additional revenues with these existing utility customers as the utilities expanded the novel E2.0 program of generating energy savings to reach more and more of the utilities' residential and SMB energy consumers.

23.     In the first four months of 2012, E2.0 generated revenues totaling $2.4 million, which was more than double the revenues generated in the entire year of 2011.  By early 2012, E2.0 was growing quickly and anticipated that its rate of growth would continue in the residential utility market and in the SMB utility market.  It had been awarded eight large contracts with major utility companies and it expected its utility company customers would expand those contracts as the E2.0 program continued to achieve verified energy savings.  E2.0's product had been favorably reviewed by a respected industry figure.  E2.0 also had established and nurtured relationships with approximately twenty other large utility companies, which were considering putting out requests for bids for the types of energy savings services provided by E2.0.  At this same time, the New York City Mayor's office recognized E2.0 as a leading start-up high tech company.

24.     In early 2012, E2.0 had an innovative product that had proven to be a success in an industry with a large potential customer base.  The company by then had approximately eighteen full time employees and had moved into new office space in New York City.  E2.0 management was engaging in active discussions with capital providers to obtain funds needed to implement management's plan to (i) expand E2.0's operations, (ii) hire additional employees to increase its marketing efforts, and (iii) further develop its programs and capabilities in the energy efficiency market.

**Relevant History of C3**

25.     Upon information and belief, C3 was and is engaged in the business of providing energy and emissions management software solutions that enable its customers to monitor, mitigate, and monetize energy usage.  Prior to May 1, 2012, C3 and E2.0 operated in different segments of the energy efficiency market.  In early 2012, C3's customers were almost exclusively in the large commercial and industrial, or enterprise, segment of the energy efficient market (referred to as either the "C&I Market" or "Enterprise Market"), including for example Dow Chemical, CISCO, Pella, and Constellation Energy.

26.     In 2011, C3 only had two utility customers, and both utility customers purchased C3 software for their C&I customers.  At that time, C3 did not have a product for use in the utility energy efficiency market in which E2.0 was operating.

27.     Nevertheless, in mid-2011, C3 submitted a bid to Pacific Gas & Electric Company ("PG&E") for a major contract to provide energy management solutions for the SMB customers of PG&E.  At the time of the bid, C3 did not possess a software product that a utility company could use to offer effective energy management programs to its SMB customers.  In the first quarter of 2012, PG&E awarded the SMB contract to C3 with an anticipated launch date sometime in the late summer or fall of 2012.

28.     C3 got the contract but it did not have the product to provide to PG&E the energy efficiency management services PG&E required with respect to its SMB customer segment.  In 2012, in order to fulfill the contract, C3 needed either to obtain SMB computer programs from another source, such as E2.0, or internally create its own untested software.

### Negotiations of a Merger of E2.0
### and a Wholly Owned Subsidiary of C3

**Introduction**

29.     On several occasions in January and February 2012, defendants Siebel and

Schmaier approached E2.0 management to discuss a potential acquisition of E2.0 by C3.  They

initiated discussions with Scaramellino, who at the age of 27, was the CEO of E2.0.  Siebel and

Schmaier claimed that, because C3 had a "strong C&I customer base and business pipeline" and

intended to focus its efforts on the "Enterprise energy management market," C3's business

would blend well with E2.0's presence in the residential and small-to-medium businesses (SMB)

utility markets and create a synergy among their respective product lines.  During these early

discussions, Siebel also acknowledged that acquiring E2.0 would fill C3's need to obtain an

SMB product to perform C3's new contract with PG&E.

30.     These initial discussions and meetings led to formal negotiations, with Siebel

designating Schmaier to represent C3 and Scaramellino acting on behalf of E2.0 and its

Unitholders.  Siebel, notwithstanding this appointment of Schmaier, remained active in the

negotiations.

31.     Siebel and Schmaier are both sophisticated businessmen.  Siebel reportedly has a

net worth in excess of $2 billion which he generated through his executive positions at Oracle

Corporation and then by founding Siebel Systems, a very successful software technology

company which Oracle acquired in 2006.  Schmaier worked with Siebel throughout those same

years at those same companies.  They both have been involved as principal negotiators in

multiple merger and acquisition transactions and numerous corporate finance transactions.

32.     Scaramellino, on the other hand, was not a sophisticated businessman or investor

and had little if any experience in negotiating mergers and acquisitions transactions.

**The Mutual Non-Disclosure**
**Agreement and Letter of Intent**

33.     On March 1, 2012, after the preliminary discussions initiated by Siebel, E2.0

entered into a Mutual Non-Disclosure Agreement with C3 regarding a possible acquisition of

E2.0.  Thereafter, defendants and E2.0 management engaged in numerous meetings, telephone

conversations, and email communications to discuss an exchange of all of the E2.0 Units for

shares in C3.  Among other things, meetings took place in E2.0's offices in New York on March

5th, March 27th, 29th and 30th.  At the March 27th session Schmaier visited the New York office,

with Edward Abbo, the President of C3, to make a presentation to E2.0 investors.  Meetings also

took place with defendants Siebel and Schmaier, together with key E2.0 employees at C3's

offices in San Mateo, California on March 12, 13, and 16, 2012.  These meetings, together with

phone calls and emails, led up to a "Letter of Intent" on March 30, 2012, which is also referred to

as a "Term Sheet."

34.     The non-binding Letter of Intent provided that in exchange for the membership

interests in E2.0, C3 would at the closing: (i) issue to the E2.0 Unitholders Class C shares of C3

worth $23.75 million, calculated based on a represented C3 pre-acquisition valuation of $500

million; and (ii) pay off at the closing E2.0's outstanding indebtedness totaling $1.25 million.

According to Siebel and Schmaier, this consideration given at the closing to the E2.0 Unitholders

was worth 5% of C3's purported $500 million valuation.  In addition, the non-binding Letter of

Intent provided that, after the closing, the E2.0 Unitholders would also receive more Class C

shares of C3 purportedly worth up to $25 million, or an additional 5% of C3's purported

valuation, in the form of an "Earn Out" if the post-merger E2.0 Business Unit achieved certain

minimum revenue and maximum loss targets in 2013, 2014, and 2015.

35.     Seibel and Schmaier, during meetings on March 12th and 13th, and Schmaier and Abbo, during meetings in New York on March 29th and 30th, spoke directly to E2.0 employees and convinced them to agree to continue to work at E2.0 after the merger by (i) agreeing to give those employees raises totaling between 50% and 300% of their current salaries, and (ii) by assuring those employees that they would be able to continue to work at the jobs they loved and were passionate about, in their same offices, and working for their same bosses.

36.     Discussions continued in April with meetings on April 17th, 18th, and 30th at C3's offices in San Mateo and Siebel's California home.

**Siebel's Agreement to a Three Year**
**Budget for the E2.0 Business Unit**

37.     During the April 17-18, 2012 meetings, Scaramellino told Siebel and Schmaier that E2.0 required that Siebel personally commit that he, Siebel, would cause C3 to provide a certain level of resources to fund the expansion of E2.0's operations under a three year budget. Scaramellino made it clear that he would not enter into the Merger Agreement proposed in the Letter of Intent unless Siebel set forth in an approved budget his own commitment to cause C3 to fund the continuation and expansion of the E2.0 business operations in the residential and SMB utility markets during the three year Earn Out period, coupled with assurances that the post-merger E2.0 would be operated as a stand-alone business with its existing staff and management continuing to work out of E2.0's New York offices.  Siebel's agreement to cause C3 to fund a three year budget for E2.0 was a condition to Scaramellino's and Blattman's consent to the Merger Agreement.  E2.0, the surviving entity in the Merger, eventually was referred to as the C3 Efficiency 2.0 Business Unit ("E2.0 Business Unit").

38.     Scaramellino asked that Siebel also sign off on, and approve, the E2.0 Business Unit Budget, as modified by Scaramellino and C3's CFO, Howie Shohet.  Siebel did so during the April 17 meeting.

39.     The approved E2.0 Business Unit Budget identified specific capital contributions by C3 to the E2.0 Business Unit in 2013, 2014, and 2015.  Among other things, those contributions by C3 were earmarked for the following items:

    a.      continued funding to pay the salaries of all of E2.0's pre-merger employees and the expenses in connection with the E2.0's offices in New York;

    b.      increasing by nearly 100% the post-merger E2.0 headcount in 2013 by hiring 14 new employees to perform sales, marketing, customer relations and technical support in the New York office of the post-merger E2.0 Business Unit;

    c.      hiring six more employees in 2014 and hiring five more employees in 2015 to perform the same functions listed above;

    d.      continued funding, including funding increases during certain periods, of independent contractor software programmers;

    e.      specific commitments to keep in New York the engineering and project management functions for the residential utility market segment; and

    f.      a specific commitment to hire a Vice President of Regulatory Affairs.

40.     The merger negotiations concluded shortly after Siebel committed to cause C3 to fund the three year E2.0 Business Unit Budget that he had approved on April 17, 2012.

**The Merger Agreement**

41.     On or about May 1, 2012, C3 and a wholly owned C3 subsidiary entered into an Agreement and Plan of Merger, dated as of April 30, 2012, with E2.0 and a representative of the E2.0 Unitholders ("Merger Agreement").  Essentially, the Merger Agreement provided that (i) E2.0 would be merged with a wholly owned subsidiary of C3, (ii) E2.0, and not the C3

subsidiary, would be the surviving merged entity, and (iii) C3 would be the sole owner of the merged entity.

42.     In exchange, the former E2.0 Unitholders were to receive, at the closing: (i) an amount of shares of C3 Class C stock that was to be determined at the closing but which purportedly would be worth $23.75 million; and (ii) C3's satisfaction of E2.0's outstanding indebtedness of $1.25 million.  According to the Merger Agreement, and consistent with Siebel and Schmaier's prior statements to Scaramellino and Blattman and in the Letter of Intent, the total number of outstanding C3 shares purportedly were worth $500,000,000 and therefore the C3 stock and debt satisfaction received from C3 on the day of the closing was purportedly worth a total of $25,000,000, or approximately 5% of the $500 million valuation of C3.

43.     In addition, the former E2.0 Unitholders agreed to defer their receipt over the next three years of additional C3 Class C shares purportedly worth $25 million as of the closing and to condition their receipt of such shares on the extent to which the E2.0 subsidiary of C3 attained certain minimum revenue and maximum loss targets in 2013, 2014 and 2015 (the "Earn Out").

**Defendants'**
**Misrepresentations and Omissions**

44.     The E2.0 Unitholders exchanged their E2.0 Units for Class C shares in C3 on May 1, 2012 in reliance upon numerous statements made to them, and numerous omissions, by defendants between March 1 and May 1, 2012.  These representations and omissions by defendants fit into three categories: (i) those designed to assure plaintiffs that C3 was a going concern and its Units were worth $500 million, (ii) those concerning the continuation of E2.0's operation as a stand-alone business and (iii) those concerning Siebel's commitment to cause C3 to provide the capital funding needed to expand E2.0's operation in accordance with the E2.0 Business Unit Budget.

13

**Defendants' Representations and Omissions**
**Regarding C3's Business and Purported $500 Million Valuation**

45.     Prior to March 1, 2012, defendants were informed by Scaramellino that the E2.0

Unitholders would not agree to an all-stock transaction in which they would receive C3 stock in

lieu of cash in exchange for their membership interests in E2.0 unless defendants were able to

show them that C3 was a financially sound company with a strong business presence and

product, and satisfied customers, in an active and viable market.

46.     Defendants therefore made during the merger negotiations a group of

representations regarding the going concern value of C3, its financial soundness, its rate of

growth, its product, its customer relations, the nature and size of the market in which it was

operating, and the reliability of its forecasted future revenue increases.  Defendants also failed to

disclose to Scaramellino and the E2.0 Unitholders material information on these same subjects.

**The Representations**
**Regarding C3's Valuation**

47.     On March 12th and March 13th Scaramellino, other members of E2.0

management and Blattman visited C3's California office in San Mateo for a series of meetings.

C3 provided an Agenda for the two days of meetings.

48.     The first meeting, which was referred to on the Agenda as "Intro / Overview,"

was held on March 12th from 9 am to 11 am, and was attended by Siebel and Schmaier, among

other C3 representatives, and Scaramellino, Blattman, and each of the E2.0 management team

that made the trip.  During the "Intro/Overview" meeting:

> a.  Siebel stated that C3 was in the business of delivering Enterprise energy
>     management software primarily for large commercial and industrial
>     corporations, which he referred to as the Enterprise or C&I market, and which
>     he said was a global market and represented a huge, $1 trillion opportunity
>     over the next decade.

b. Siebel stated repeatedly that C3 already had a rapidly growing business in the Enterprise, or C&I, market.  Siebel spoke of sales proposals delivered to large corporations in partnership with SAIC, a leading energy consulting firm, and that he anticipated winning a number of the proposals, which was the core focus of the C3 sales team.  He repeatedly represented that he received strong positive feedback from both existing customers and prospective customers.

c. Schmaier stated that C3 projected that within three years its annual revenues in the Enterprise, or C&I, market would increase to $80 million.

d. Schmaier also stated that the goal of the merger was for the E2.0 Business Unit in the residential and SMB utility market to supplement the core business of C3 in the Enterprise or C&I market by generating $20 million in annual revenues by year end 2015, as compared to C3's projected annual revenues of $80 million in the Enterprise, or C&I, market.

e. Both Schmaier and Siebel stated that at a combined $100 million annual revenue rate by year end 2015, the company then could be sold for 10 to 20 times revenues given Siebel's reputation.

f. To lend credibility to his representations about C3's market successes, Siebel also represented, in response to a question from Blattman about changes in C3's headcount raised during this meeting or in a separate meeting on March 12th or March 13th, that, with the exception of C3 having recently laid off some engineer employees in China with a view to replace the lost engineering capacity through resources available to C3 in the United States, C3's headcount of employees had been increasing and most recently had risen from 74 employees to 98 employees.

49.   The bulk of the first day of meetings on March 12th related to the E.20 business and product.  However, at the conclusion of the day on March 12th, there was one final meeting referred to on the Agenda as "E2.0 and C3 Team Dinner" from approximately 7:30 pm to 9:00 pm.  In addressing the E2.0 attendees, including Scaramellino and Blattman, at the "Team Dinner," Siebel repeated his earlier statements that C3 was flourishing in the "freaking huge" Enterprise, or C&I, energy management market.

50.   Siebel further added during the "Team Dinner" that C3 was well positioned to capture substantially more business in that huge market.  To support that assertion he said that C3 had successfully launched its software with all of its customers in the Enterprise, or C&I,

energy management market, that all of C3's customers were satisfied with C3's software product, and that C3's revenues were continuing to grow and were expected to continue to grow at an even greater pace each year over the next three years.

51.    The Agenda of meetings resumed on March 13th.  A meeting referred to on the Agenda as "E2.0 and C3 Deal Terms Overview" was held on March 13th from 11 am to 12:30 pm and was attended by Siebel and Schmaier, among other C3 representatives, and by Scaramellino and Blattman.  During the "Deal Terms Overview" meeting, Siebel and Schmaier represented to Scaramellino and Blattman that:

  a.  under the terms they were proposing, E2.0 would initially receive at the closing a 5% interest in C3, and would have the opportunity, upon attaining minimum revenue and maximum loss targets in 2013, 2014 and 2015, to receive an additional 5% of C3.

  b.  Siebel stated that C3 was worth at least $500 million, asserting that he had received term sheets from separate investors valuing the company at that amount and had received a term sheet from one investor valuing the company at $1 billion.

  c.  Siebel stated to Blattman that at a $500 million valuation of C3, E2.0 Unitholders would be receiving a minimum of $25 million in stock at the closing, or 5% of C3's purported $500 million valuation, plus up to an additional $25 million in C3 stock, or another 5% of C3's purported $500 million valuation, upon the attainment of certain financial milestones in 2013, 2014 and 2015.

  d.  Siebel also stated to Blattman, either during the Deal Terms Overview, or in a separate meeting on that same day, that given the improvements he had described in C3's position in the C&I, or Enterprise, market since 2010; *i.e.* the increases in C3 revenue, the purported successful launch of its products, and the then purportedly reliable pipeline of future customers, C3 was worth double what it had been worth eighteen months earlier when in the second or third quarter of 2010 C3 had obtained financing based on an established valuation of over $250 million.

52.    Siebel also stated during the Deal Terms Overview meeting on March 13th that: (i)

16

all of C3's customers were happy, (ii) the C3 software had been delivered successfully to all of C3's Enterprise, or C&I, customers who were using the software to deliver value in their energy operations, and (iii) each of C3's customers had paid C3 in full in a timely manner and there were no payment disputes.

53.     A meeting referred to on the Agenda as the "Lunch and Brainstorm of E2.0 and C3 Market Pitch" was held from approximately 1:30 pm to 2:30 pm on March 13th and was attended by all of the E2.0 representatives and all of the C3 representatives, including Siebel and Schmaier.  During the "Lunch and Brainstorm" meeting, Pat House, a senior executive at C3, stated in the presence, and with the approval, of Siebel, that C3's core business was in the Enterprise, or C&I, market which was purported to constitute a much larger opportunity than in the utility market and that the future revenues generated in E2.0's business in the utility market would serve only as a small supplement to the future revenues generated in C3's core business.

54.     During a meeting on March 12th or March 13th, Siebel represented to Scaramellino that C3 forecasted annual increases in C3's revenue in the Enterprise, or C&I, market in 2012, 2013, 2014, and 2015, with the forecasted increases ranging from approximately 50% to 75% over the prior year.

55.     On March 27, 2012, Schmaier attended a meeting in the New York Offices of E2.0 and made a presentation to the investors in E2.0.  In that presentation, Schmaier repeated all of the above statements in paragraphs 48 through 54 regarding the value of C3, and the nature of its business, and the projected growth of C3's revenues in the Enterprise, or C&I, energy efficiency market over the next three years.

56.     On March 30, 2012, Siebel and Schmaier reinforced their representations about the attributes of C3's C&I, or Enterprise, business and the value of that business by setting forth

17

in the Letter of Intent that C3 had a valuation of $500 million, without regard to the value added by the acquisition of E2.0, and that the consideration the E2.0 Unitholders would initially receive at the closing would include certain debt satisfaction and C3 Units worth 5% of that $500 million valuation, and the E2.0 Unitholders could later receive over the next three years C3 stock worth up to another $25 million as of the closing, or another 5% of C3's purported $500 million valuation.

57.     On April 17th, Scaramellino and Blattman attended meetings at C3's offices in San Mateo California.

58.     During one meeting Siebel attended with Blattman on April 17th, Siebel repeated the statements he had made during the March 13th Deal Terms Overview meeting that eighteen months earlier, in the second or third quarter of 2010, C3 had obtained financing based on an established valuation of over $250 million and that C3 was worth double that given the increases in C3 revenue in the C&I, or Enterprise, market since 2010, the purported successful launch of its products, and the then purportedly reliable and productive pipeline of future customers in that market.

59.     During a meeting referred to on an Agenda as "Acquisition Status / Go Forward Plan Discussion" Siebel, as more fully discussed at paragraphs 37 through 40 and 118 through 120, agreed to, and represented he would cause C3 to, implement a three year budget for the funding of an expansion of the operations of the E2.0 Business Unit after the Merger, including the hiring of additional technical and sales persons.  That agreement and representation by Siebel lent further credence to his statements that the core of C3's business was in the Enterprise, or C&I, market, and not in the smaller Utility market.  That agreement and representation also lent further credence to Siebel's statements that C3 was financially sound, was flourishing and

18

growing rapidly in the Enterprise, or C&I, market, with forecasts for rapidly increasing revenues which would enable C3 to fund the expansion of the E2.0 Business Unit in accordance with the approved three year E2.0 Business Unit Budget.

60.     On April 17th, a meeting which was referred to on the Agenda as the "Working Lunch-Go to Market Strategy Discussion" was held at 12 pm to 1:30 pm and was attended by Siebel, Schmaier and several other C3 executives, along with Scaramellino and Blattman. During the "Working Lunch" meeting, apparently a dress rehearsal for the subsequent dinner meeting at Siebel's home on April 17th, each or at least most of the other C3 executives attending the meeting (Mr. Shanaa, Mr. Shohet, Ms. House and Mr. Abbo) stated in Mr. Siebel's presence and with his approval that C3 intended to continue to focus its efforts on continuing to expand its presence and successes in the rapidly growing C3 business in the Enterprise, or C&I, energy management market, and that E2.0's utility business would be a relatively much smaller supplement to C3's overall sales.

61.     At the dinner meeting at his home, Siebel reinforced his earlier representations to Scaramellino and Blattman.  He said that the Enterprise, or C&I, energy management market was "freaking huge" and that C3 was well positioned to capture a greater share of that market. He stressed C3 had successfully launched its software product with its customers, that C3's customers were happy with C3's software product, and that C3's revenues in the Enterprise, or C&I, energy management market were continuing to grow.  To drive his point home, he gave Scaramellino a tour of his home, and told Scaramellino that if he worked with Siebel "all this could be yours one day."

62.     Siebel also repeated to Scaramellino and Blattman during the April 17th meetings that given the forecasted annual increases in C3's revenue in the Enterprise, or C&I, market in

2012, 2013, 2014, and 2015, C3's annual revenue in that market would reach $80 million in 2015.

63.     Finally, the Merger Agreement provides that C3 has a valuation of $500 million and that the consideration provided to the E2.0 Unitholders would consist of debt satisfaction and C3 Units with a value totaling $25 million, or 5% of the $500 million valuation.  Rather than set forth the precise number of C3 shares that were to be provided to each holder of E2.0 Units in exchange for their E2.0 Units, the Merger Agreement instead provides a multi-step formula to calculate that precise number of shares based on the purported value of those shares.  That formula includes what is defined in the Merger Agreement as the "Unit Divisor" of 3.33.  In the Merger Agreement the 3.33 Unit Divisor is the purported $3.33 per unit value of a C3 share, which is used to ascertain the number of C3 shares that equate to a particular dollar amount.  For example, the Merger Agreement provides that at the closing a specified dollar amount was to be held back by C3 from the consideration payable to the E2.0 Unitholders, which dollar amount was to be converted into a specified number of "Holdback Units" of C3 shares.  The "Holdback Amount" was defined in the Merger Agreement to be $4,000,000 and the number of "Holdback Units" equated with the $4,000,000 Holdback Amount was defined as 1,201,201 Parent Units (*i.e.*, C3 shares).  That exact number of C3 shares is ascertainable by dividing the $4,000,000 Holdback Amount by the $3.33 Unit Divisor.  Thus, in the Merger Agreement each share of C3 was purported to have a value of $3.33.

64.     Similarly, the multi-step formula in the Merger Agreement to calculate the dollar amount due to the E2.0 Unitholders at the closing also dictates that the dollar amount so derived from the formula be divided by 3.33 in order to ascertain the number of C3 shares to be delivered

20

to the E2.0 Unitholders at the closing.  Again, this confirms that in the Merger Agreement each share of C3 was purported to have a value of $3.33.

65.     The Merger Agreement separately sets forth the aggregate number of issued and outstanding Units in C3 and C3 Units subject to options or warrants (150,009,001 units or shares of C3).  When that amount of shares is multiplied by the $3.33 per share or per unit value also set forth in the Merger Agreement it reveals that in the Merger Agreement the aggregate total value of all of the C3 Units or shares, as of the closing date, was purported to be $500,000,000.

66.     The fact that the C3 shares are purported in the Merger Agreement to be worth $500,000,000 is further confirmed by the "Exchange Model" prepared by defendants' counsel for use at the closing to ascertain: (i) the actual number of shares that were to be delivered to the E2.0 Unitholders at the closing and (ii) the maximum additional C3 shares that could be delivered after the closing, depending on the attainment of certain revenue and profit milestones in the Earn Out provisions of the Merger Agreement.  Plaintiffs do not have access to the final "Exchange Model" used by C3's counsel at the closing, but do have a prior iteration of the document dated two weeks before the closing.  Based on the information in that prior iteration of the Exchange Model, it is apparent that the final Exchange Model prepared by C3's attorneys confirms that in the Merger Agreement formula used to determine the number of C3 shares to issue to the E2.0 Unitholders C3 is purported to have a value of $500 million, and that the E2.0 Unitholders were to receive at the closing debt satisfaction and C3 Units purportedly worth $25,000,000, and a maximum number of Earn Out shares with a purported value equal to the "Maximum Earn Out Payment" of $25,000,000.

**Defendants' Omissions**
**Regarding C3's Valuation**

67.     During the same period of time when defendants were making the representations set forth above in paragraphs 47 through 66 regarding the purported $500 million valuation of C3, and the purported attributes of C3's business which support that valuation, both Siebel and Schmaier were also failing to disclose to, and actively concealing from, Scaramellino and the E2.0 Unitholders numerous material facts on those same subjects.  The concealed information reveals that Siebel and Schmaier knew prior to May 1, 2012 that C3's business in the Enterprise, or C&I, market was declining and possibly failing.  Specifically, Siebel and Schmaier failed to disclose at any of the meetings on March 12-13th, March 27th, and April 16-17th, or in any of the numerous telephone conversations with Scaramellino, or at any other time during the negotiations, the following material information:

(i)      Prior to year end 2011, Siebel and Schmaier concluded the market in which C3 was operating its Enterprise, or C&I, energy management business was no longer a reliable source for new business;

(ii)     At year-end 2011, C3 knew it "fell well below" its annual and fourth quarter forecasted Enterprise, or C&L, revenues for 2011 and in the first quarter of 2012, C3 again substantially missed its revenue forecasts;

(iii)    At year-end 2011, the C3's Sales Team committed to explore the reasons behind the missed revenue forecast, including sales execution, market awareness, C3's sales model, market maturity and product maturity;

(iv)     At least by year end 2011, Siebel and Schmaier were aware that projections of growth of C3 annual revenues in annual increments leading up to $80 million of annual revenue in year 2015 in the Enterprise, or C&I, market was not even remotely realistic;

(v)      By year end 2011 and first quarter of 2012, Siebel and Schmaier were aware that C3's revenues in the Enterprise, or C&I, energy management market were not continuing to grow and had become stagnant;

(vi)    In the first month of 2012, as a result of the diminution in demand for its products in the Enterprise, or C&I market, C3 terminated its entire International Sales force;

(vii)    In the fourth quarter of 2011 and the first quarter of 2012, Siemens, a major customer and one of less than ten C3 customers, complained about the quality of C3's software, rejected C3's bid for new business, and terminated its contract with C3;

(viii)    In the fourth quarter of 2011 and the first quarter of 2012, Dow Chemical, one of less than ten existing customers of C3, expressed dissatisfaction with the performance of the software product provided by C3;

(ix)    In the fourth quarter of 2011 and the first quarter of 2012, Masdar City, another of the less than 10 customers of C3, complained about the quality of the software product provided by C3, withheld payment, rejected a bid for new business, and demanded that its contract with C3 be re-negotiated at a lower rate;

(x)    In the fourth quarter of 2011 and the first quarter of 2012, Vimpelcom, another existing customer of C3, complained about the quality of the software product provided by C3, and was behind in a substantial payment due to C3 for software product;

(xi)    In the fourth quarter of 2011, Orascom complained about the quality of the software product provided by C3, and failed to make a payment for that product;

(xii)    In the fourth quarter of 2011 and the first quarter of 2012, the C3 sales team had concluded that General Electric ("GE") had different expectations and perception than C3 had regarding what C3 should have delivered to GE under its contract, GE was slow in paying the amounts due to C3 under the contract, and the sales team was endeavoring to mend that relationship;

(xiii)    In the first quarter of 2012, the C3 sales team deemed it necessary to implement a "Win Back Strategy" designed to restore lost business and solidify relationships with Dow Chemical, Constellation, General Electric, Siemens and Vimplecom, but that strategy did not have the success hoped for by the sales team;

(xiv)    In the last quarter of 2011 and first quarter of 2012 the C3 sales team acknowledged its ineffectiveness in acquiring new business in the Enterprise, or C&I, market;

(xv)    For several months before the Merger, the sales force was complaining to Siebel that there were no viable opportunities in the Enterprise, or C&I, business area for them to meet their performance based compensation targets;

(xvi)   Prior to, or during, the negotiation of the Merger, Siebel and Schmaier had determined that immediately after the Merger, C3 and C3's sales team would eliminate or substantially diminish its efforts to obtain new business in the Enterprise, or C&I, market, and instead would pivot almost exclusively to the residential and SMB utility market segments;

(xvii)  In late 2011, or the first quarter of 2012, C3's headcount was decreasing, and was not increasing as had been represented.

68.     Each of these facts that Siebel and Schmaier failed to disclose prior to the Merger was material information that Scaramellino and the E2.0 Unitholders, and any reasonable investor, would have viewed as substantially altering the mix of available information regarding the transaction had the information been disclosed.

69.     In particular, if truthful information regarding customer complaints about C3's product and payment disputes (paragraph 67 (vii) through (xiii)), had been disclosed, Scaramellino and the E2.0 Unitholders would have been able to assess and evaluate the critical pre-merger questions whether C3 had a successful product in the Enterprise, or C&I, market, with satisfied customers, who were paying their bills in full and in a timely manner without dispute.

70.     Similarly, if truthful information had been disclosed regarding the difficulties C3 was encountering in selling its product in the Enterprise, or C&I market, and C3's knowledge that it was not and could not hit the forecasts of future revenues in that market (paragraph 67 (i) through (vi) and (xiii) through (xvii)), Scaramellino and the E2.0 Unitholders would have been able to better assess and evaluate important information about the value of C3's Enterprise, or

24

C&I, business and whether C3 had had any realistic prospect of generating $80 million in annual revenue by year end 2015.

71.     Defendants Siebel and Schmaier by their actions acknowledge the materiality of such information.  Specifically, they actively worked to conceal the omitted facts from Scaramellino and the E2.0 Unitholders.  They both knew that none of the omitted information listed above in paragraph 67 was available to the public, and that they possessed unique access to such information.  Nevertheless, the information C3 did provide to Scaramellino and the E2.0 Unitholders failed to disclose any of the contemporaneous internal records at C3 regarding these omitted facts.  Moreover, when Scaramellino or the E2.0 Unitholders asked them questions that would prompt disclosure of such omitted facts, Siebel and Schmaier continued to be evasive in their responses.  Most importantly, Siebel and Schmaier on grounds of alleged confidentiality refused requests by Scaramellino and the E2.0 Unitholders to talk to C3's existing or prospective customers in the Enterprise, or C&I, segment of the energy efficiency market, thereby preventing them from learning anything about the customer dissatisfaction with the C3 product, the payment issues, the drop in interest of potential Enterprise customers in C3's product, or the likelihood that C3 would not continue to grow or come remotely close to the forecasted revenue growth in the Enterprise, or C&I, segment of the energy efficiency market.

72.     In addition, the unaudited balance sheets that C3 did provide to Scaramellino, and which C3 represented in the Merger Agreement "presented fairly in all material respects the financial condition of C3," were in fact inaccurate because those financial statements did not disclose any of the omissions of material facts set forth above.

**The Truth of the Omissions Regarding
C3's Purported $500 Million Valuation**

73.     The truth regarding the omissions set forth in paragraph 67 is demonstrated by, *inter alia*, (i) contemporaneously kept weekly management reports in late 2011 and the first three months of 2012, and (ii) interviews with former C3 executives Dave Oricco, Joseph Krasko and Scaramellino, who have first-hand knowledge of the pertinent facts.  Scaramellino, who was a C3 executive between May 1, 2012 and November 29, 2012, had access to the weekly management reports, and provided same to plaintiffs in December 2012.

74.     The weekly management reports in late 2011 and the first two quarters of 2012, demonstrate that C3's customers were complaining about the effectiveness of the C3 product, and were refusing to pay or disputing payment of amounts purportedly due under their contracts. See paragraph 67 (vii) through (xiii).  That information was confirmed by Dave Oricco, who had been C3's top sales executive prior to the Merger and who was fired within approximately six weeks of the Merger.  Mr. Oricco said C3's customer dissatisfaction with the C3 software product was discussed in executive meetings in 2011 and early 2012.  He noted that Seibel and Schmaier knew long before the Merger that C3 customers were complaining the C3 software was not working, and were stating that they were going to "rip it out."

75.     Joseph Krasko, another C3 sales executive who was fired in June 2012, also confirmed to plaintiffs in December 2012 that everyone at C3 management was aware in early 2012 that C3's software was not actually being used by its customers, and those customers were not going to renew or extend their contracts with C3.  Krasko noted that in early 2012 there were what he described as "key accounts" which were in poor shape and were failing to pay on time. Krasko also noted that Seibel's ability to generate prior software sales based on his reputation,

but without a viable product or market, was not a basis on which to build a sustainable business model.

76.     Scaramellino, in his new role as an executive of C3, attended a weekly executive meeting on May 21, 2012, during which Siebel and Ed Abbo, the C3 President, revealed that several customer deployments in the Enterprise market, including the Dow Chemical, Masdar City and Constellation Energy accounts, had been underperforming, and the product either was not functioning as intended or was not deployed at all.  They specifically mentioned a payment of $750,000 from Masdar City had been withheld several months ago.

77.     Similarly, the truth that the Enterprise, or C&I, market was stagnant and inactive, that there was very little demand in that market, that C3 was having difficulties in marketing its product, and that C3 was failing to meet its current revenue forecasts (See paragraph 64 (i) through (vi) and (xiii) through (xvi)), was also demonstrated in the weekly management reports in late 2011 and the first two quarters of 2012.

78.     That information was confirmed by Dave Oricco, who informed plaintiffs in November 2012 that C3's failure to meet forecasted revenue targets, and the lack of any meaningful demand in the Enterprise, or C&I, segment of the energy efficiency market, had been discussed in weekly management meetings which he attended along with Siebel and Schmaier in 2011 and early 2012.  In addition, Dave Oricco, informed plaintiffs that for some time prior to the Merger Siebel and Schmaier knew the internal projections of sales revenue and closed deals in the Enterprise or C&I market "had no basis in reality" and knew the C3 salesmen working the C&I market doubted the business strategy.

79.     An anonymous executive of C3 in 2012, who was in a position that required attendance at, and who did attend, executive meetings with Siebel and Schmaier during March

and April 2012, has informed plaintiffs that he knew prior to the Merger that Siebel intended immediately after the Merger to pivot C3's resources entirely to the Utility business, and forego pursuing C3's core business in the Enterprise, or C&I, market,

80.     Joseph Krasko, another C3 sales executive who was fired in June 2012, also informed plaintiffs in December 2012 that he knew his termination was coming because there had been no market for him to sell into in the Enterprise business, and therefore he had not been really working for months prior to his termination.

81.     In addition, a weekly C3 Sales Report covering the week of April 29 to May 5, 2012, and dated May 5, 2012, just four days after the execution of the Merger Agreement, reveals that the C3 Sales Team had shifted its focus to the residential and SMB Utilities market in which E2.0 operated, and had pivoted away from the purported core of C3's business in the Enterprise, or C&I, market.  C3 had determined, in a dramatic strategy change, that its core business in the Enterprise, or C&I, market would be reduced to only "cherry picking" opportunities, and C3 would be selective in pursuing opportunities in that market, whereas C3 would be devoting nearly all its resources to pursue business in the utility market in which E2.0 had operated and which C3 had referred to as being only supplemental to C3's core Enterprise, or C&I, business.

82.     Scaramellino attended a weekly executive meeting on May 21, 2012, during which Siebel stated that the Enterprise, or C&I, market (which only one month earlier Siebel had described as "freaking huge" and said C3 was well positioned to continue to exploit after the Merger) actually had not presented an opportunity to C3 for some time and that the pipeline in the market had "vaporized."  He said that the conditions that existed in the market and led to C3's early contracts in 2009 had evaporated over 2010 and 2011, and that the market "simply

never materialized."  Siebel did not attempt to identify a single factor that arose after the Merger which could have caused the Enterprise, or C&I, market to have "vaporized."  In keeping with lack of candor, Siebel told members of his staff to blame C3's dismal performance on a drop of energy prices after a 2009 energy price spike, and decreased political interest in potential carbon emissions "cap and trade" legislation.  These factors, if valid considerations, had taken place two years before the Merger Agreement according to a C3 executive meeting memoranda.

**The Falsity of Representations Regarding the**
**C3 Business and its Purported $500 Million Valuation**

83.     Defendants' representations regarding the attributes of C3's business which purportedly supported a $500 million valuation were false, as shown by defendants' omissions of truthful information about C3's product, its customer relations, the relevant market in which it operated, and its forecasted revenues in that market.  Specifically, the representations that the Enterprise, or C&I, market was active, that C3 had a rapidly growing business in that market, and that C3's annual revenues in that market segment would continue to rise annually and reach $80 million in annual revenues by 2015, were false when made in light of the truthful information, set forth above in paragraphs 67 and 71 through 82.  In light of that information, during the negotiation of the Merger Agreement it is clear: (i) Siebel and Schmaier did not view the C&I, or Enterprise, market as a favorable opportunity for C3; (ii) C3 did not have a reliable business pipeline in the C&I, or Enterprise, market; and (iii) C3's share of, and revenues earned, in the C&I, or Enterprise market, was expected to remain static or decline, and was not expected to increase in line with the projections defendants shared with plaintiffs.

84.     Similarly, as defendants well knew, each of the representations that (i) C3 had successfully launched its software with all of its customers in the Enterprise, or C&I, market, (ii) all of those customers were using, and were satisfied with, C3's software product, and (iii) each

of C3's customers had paid C3 in full in a timely manner and there were no payment disputes also was false when made, as shown by defendants' omissions of the truthful information set forth above in paragraphs 67, and 71 through 82.   In light of that information, it is apparent that: (i) C3 had not successfully launched its software product with many of its customers, (ii) many of C3's customers were dissatisfied with C3's software, and (iii) C3's C&I, or Enterprise, customers, due to their dissatisfaction with C3's product, had been withholding or challenging payments due under existing contracts, demanding re-negotiations of, and/or concessions in, their contracts and payments, and declining to renew their contracts or expand their business with C3.

85.     Defendants' representations that C3 had a value of $500 million was false when made, as shown by the truthful information concealed by Siebel and Schmaier (see paragraphs 67 and 71 through 82).  Given the facts that: (i) C3's core business operated in a stagnant, or vaporized, market, (ii) C3 did not have a good track record of successful deployments of its software product, (iii) C3 did not have good customer relations and was engaged in payment and contract disputes with most of its customers, (iv) C3 was failing to hit its revenue targets in 2011, and (v) C3 had no rational basis to forecast a growth of annual revenues to $80 million by 2015, C3 could not possibly have had a $500 million valuation in May 2012.

86.     The falsity of that representation is further shown by the fact that within three months of the Merger, C3 offered to sell optioned C3 shares to a former E2.0 Unitholder.  The price C3 set for the option exercise purportedly was supported by a Section 409A valuation report which valued the optioned shares at more than two thirds less than C3's optioned shares had been valued prior to the Merger, and the only possible basis for that reduction is attributable to the very facts about the C3 business that had been concealed during the Merger negotiations.

**Defendants' Awareness of the Falsity of their
Representations, and the Truth of their Omissions, Regarding
C3's Business and its Purported $500 Million Valuation**

87.     It was the practice at C3 to circulate all executive memoranda to Siebel and

Schmaier.  Moreover, as noted above, defendants were apprised in meetings of the facts set forth

above in paragraphs 73 through 82.

88.     The executive memoranda referred to above, and the statements of Mr. Oricco,

Mr. Krasko, an anonymous C3 executive, and Scaramellino establish that Siebel and Schmaier

had knowledge of information that was inconsistent with their representations regarding the

value of C3, its product, its customer relations, the size of the C3 opportunity in the Enterprise,

or C&I, market, the reliability of C3's business pipeline in that market, and the C3 forecasts of

future revenues over the three years following the Merger.  But notwithstanding this knowledge

and information, neither Siebel nor Schmaier disclosed that information to Scaramellino or the

E2.0 Unitholders.   Instead, they concealed from plaintiffs and the other E2.0 Unitholders that:

(i) they no longer viewed the C&I and Enterprise market as a favorable opportunity for C3; (ii)

C3's product had not performed well, and would not perform well, in the C&I and Enterprise

market; (iii) C3 did not have a satisfied customer base; (iv) C3 did not have a reliable business

pipeline in the C&I and Enterprise market; (v) C3's share of, and revenues earned, in the C&I

and Enterprise market would remain static or decline, and would not increase in line with the

projections they shared with Scaramellino, plaintiffs and the other E2.0 Unitholders; and (vi)

C3's C&I and Enterprise customers, due to their dissatisfaction with C3's product, had been

withholding or challenging payments due under existing contracts, demanding re-negotiations of,

and/or concessions in, their contracts and payments, and declining to renew their contracts or

expand their business with C3.

89.     Siebel's own statements at the May 21, 2012 weekly executive meeting, attended by Scaramellino, confirm his pre-Merger awareness of the truth of the omitted facts. Specifically, Siebel stated that the Enterprise, or C&I, market, actually had not presented an opportunity to C3 for some time and the pipeline in the market had "vaporized." He said that the conditions that existed in the market and led to C3's early contracts in 2009 had evaporated over 2010 and 2011, and that the market "simply never materialized."

90.     During that same meeting Siebel and Ed Abbo, the C3 President, revealed to Scaramellino information about customer complaints and disputes in 2011 and early 2012 which information was directly contrary to Siebel's statement in April that: (i) there had been successful software deployments with all of C3's customers, (ii) all of C3's customers were satisfied with C3's product, and (iii) C3 did not have any outstanding payments in dispute.

91.     Because they knew that their representations about the factors that they asserted supported a $500 million valuation of C3 were not true, defendants also knew (i) that the shares and other consideration the E2.0 Unitholders were to receive at the closing of the Merger were not worth anything close to $25 million, and (ii) that, even if the E2.0 Unitholders received in 2013 through 2015 the maximum number of shares allowed under the Earn Out, those additional shares would not be worth anything close to $25 million.

**The E2.0 Unitholders Justifiably Relied
upon Defendants' $500 Million Representation**

92.     Plaintiffs believed and relied upon the false representations referred to above when entering into the Merger Agreement and giving up their Units in E2.0 in exchange for Class C shares of C3. But for the representations of Siebel and Schmaier, plaintiffs would not have agreed to the Merger and delivered their shares to C3 in return for C3's class C shares with the promise of additional Earn Out shares.

93.     Plaintiffs and the other E2.0 Unitholders justifiably relied upon defendants'
representations about the purported attributes driving the $500 million valuation of C3, such as
C3's claim of purported happy customers in the C&I, or Enterprise, market, C3's supposed
strong market presence, proven products, and reliable pipeline of future business in that market,
and defendants' projections of C3's future growth in that market.  Defendants also were in a
unique position to possess the true facts regarding C3's past performance, and its projected
future performance, in the C&I, or Enterprise market.  Defendants deliberately concealed C3's
most current performance data at the time of the Merger.  The E2.0 Unitholders were not in any
position to evaluate those representations, particularly after they requested to talk to C3's
customers in that market but defendants, citing purported confidentiality reasons, refused to
consent to such communications.

94.     In addition, plaintiffs justifiably relied upon defendants' misrepresentations about
the purported attributes driving the $500 million valuation because: (i) Siebel claimed to have
received from other businesses term sheets valuing C3 at $500 million, and from Goldman Sachs
a financing proposal based on a $1 billion valuation, but plaintiffs could not have known or
ascertained whether those valuations were based on assumptions that were no longer true or
feasible, particularly when C3 had not disclosed its most recent performance in the C&I, or
Enterprise, market or C3's plan to curtail its efforts to expand its share of that market, and (ii) the
E2.0 Unitholders asked for a Letter of Intent setting forth the proposed terms of the deal, and
defendants and C3 repeated in the Letter of Intent that C3 had a $500 million valuation.

**Defendant's Representations Regarding A
"Stand-Alone" Operation Consistent With
The E2.0 Business Unit Budget**

**Representations and Omissions
Regarding a "Stand-Alone" E2.0 Business Unit**

95.     Prior to Scaramellino's agreement to the Merger Agreement, Siebel assured

Scaramellino that E2.0 would continue to be operated as a separate entity with E2.0's existing

team of officers and employees, managed by Scaramellino, operating that business out of the

former E2.0 offices in New York.  Scaramellino and plaintiffs were certain, and Siebel and

Schmaier asserted themselves, that if E2.0 was operated as a separate entity by the same

management and staff, out of the same offices in New York, with the same products and the

same customers and potential customers that E2.0 had prior to the Merger, then the E2.0

Business Unit would achieve the Earn Out goals.  It also made it easier to calculate the Earn Out,

because the books of revenue and expenses would be kept separately by E2.0 and C3.

96.     As noted above, in early 2012, E2.0 was seeking capital to fund its expansion and

growth in the residential utility energy savings market.  Defendants Siebel and Schmaier were

aware prior to March 1, 2012 that E2.0 was seeking such capital for such purposes in part

because Scaramellino told them so.  During the Merger negotiations Siebel and Schmaier both

made numerous representations about how the Merger would provide E2.0 the capital it required

to fund its expansion with Scaramellino and the full E2.0 team maintaining their employment in

their same offices and working with their same customers and potential customers.  Since an

important element of the proposed Merger was an Earn Out provision enabling the Unitholders

to receive up to $25 million over a three year period, the continuation of the pre-merger

management of the E2.0 Business Unit was a critical issue.

97.    During the "C3 Intro/Overview" meeting on March 12, 2012, Schmaier stated, in the presence and with the approval of Siebel, to Scaramellino, Blattman and other E2.0 representatives that the Merger would be in effect a "reverse acquisition" in that E2.0 was essentially raising capital to fund its continuing operations.  He stressed that after the Merger E2.0 would be permitted to operate its residential utilities business as it had done so prior to the Merger, simply with additional resources and the expertise and credibility given C3's impressive board of directors and management team.

98.    During the "E2.0 & C3 Deal Terms Overview" meeting on March 13th, Siebel told Scaramellino, Blattman and the other E2.0 representatives that he was impressed with the E2.0 engineering process and that a key part of the post-merger activities would consist in disseminating the E2.0 engineering practices into C3's engineering culture.

99.    During the E2.0 & C3 "Technology Synergies" meeting on March 13th in talking to Scaramellino and the other E2.0 representatives, Siebel reiterated that E2.0 would maintain full control over its engineering, product and software delivery capabilities, and that the only resource requirements related to C3 would be to help disseminate E2.0 practices to C3 employees in San Mateo.

100.    During the "Organizational Structure and Next Steps" meeting on March 13th, in describing the post-merger management to Scaramellino, Blattman and the other E2.0 representatives, Schmaier reiterated, again in the presence and with the approval of Siebel, that the Merger would essentially be a "reverse financing" in which E2.0 would be given resources needed to expand its business operations in the residential utility market, and he stressed his and Siebel's commitment to providing E2.0 that capital.  Schmaier also described a post-merger management structure at E2.0 in which Scaramellino, as the CEO and Manager of E2.0, would

maintain full P&L responsibility, have full hiring authority and have responsibility for sales and business development of E2.0's potential customer pipeline to drive the growth of the E2.0 Business Unit.

101.     On March 27, 2012, Schmaier and Edward Abbo, the CTO of C3, made a presentation to the E2.0 investors in E2.0's New York City offices.  During this presentation, Schmaier stressed to the investors that the Merger was a "reverse financing" or "reverse acquisition" because he and Siebel were committing that C3 would provide the resources E2.0 required to fund the growth in its operations.  Schmaier also represented that E2.0 management would continue to have full management responsibility for the growth and development of the E2.0 business after the Merger.

102.     During the "Engineering Recruiting Discussion" on April 17, 2012, Siebel, Shanaa and Mirchandeny represented to Scaramellino that they were committed to growing the engineering capacity and headcount of the E2.0 Business Unit in New York City in line with the Budget approved by Siebel and the C3 CFO.

103.     During the "Working Lunch-Go to Market Strategy Discussion" meeting on April 17, 2012, attended by Scaramellino, Schmaier and all or most of a group of other C3 executives including Shohet, Shanaa, Pat House, Ed Abbo, Mirchandeny and Hassman, in the presence and with the approval of Siebel, emphasized the independent nature of the E2.0 Business Unit, and the necessity of permitting it to maintain a level of autonomy to grow effectively.

104.     During the "Engineering Recruiting Discussion" on April 17, 2012, Siebel, Shanaa and Mirchandeny told Scaramellino that they were committed to growing the engineering capacity and headcount of the E2.0 Business Unit in New York City in line with the hiring plan approved by Siebel and the C3 CFO in the Budget resourcing model which was a pre-condition

to E2.0 agreeing to any modification in the Earn Out provisions in the Letter of Intent. Siebel again stated that after the Merger the residential utility product and associated engineering functions would be delivered and managed by Scaramellino from the New York City, while C3's Enterprise and small to medium business utility management product and engineering functions would be operated out of C3's offices in San Mateo.

105.    The Letter of Intent, in keeping with Seibel's representations, further provided that C3 would make offers of employment to all current employees of E2.0, and that acceptance of employment by eleven of those employees was a condition to the Closing. The Earn Out provisions also referenced the employee headcount reporting to Scaramellino and the operational costs of E2.0 in its New York offices and with respect to E2.0's product.

106.    In addition to making the representations set forth above that E2.0 would continue to be operated as a separate entity by the pre-merger E2.0 team, with Scaramellino as its manager, both Siebel and Schmaier also failed to disclose to, and actively concealed from, Scaramellino and the E2.0 Unitholders information:

> (i)     that, due to the stagnant state of the Enterprise, or C&I, market, C3's difficulties in successfully deploying its software product for its existing customers, the dissatisfaction of C3's customers with the C3 product, and the complaints and payment disputes with those customers, C3 in April 2012 was in a position that it had to redirect idle C3 personnel to work on E2.0 business and had to lay off E2.0 personnel in order to save C3 from failure as a company (¶¶ 67(i) to (xvii) and 74-82);

> (ii)    that from the start of the merger negotiations with E2.0, and due to their knowledge of the failing C3 business in the Enterprise, or C&I, market, Siebel and Schmaier intended immediately after the Merger to change C3's pre-merger business strategy of seeking to grow its core business in the Enterprise, or C&I, market to a post-merger strategy of having C3 personnel pursue E2.0's utility customers, and to begin terminating E2.0 employees to further that dramatic change in the business strategy of C3 (¶¶ 73-82); and

(iii)     that Siebel and Schmaier never intended to permit E2.0 to operate as a stand-alone entity (¶¶ 110-114).

107.    Each of these facts that Siebel and Schmaier failed to disclose prior to the Merger was material information that Scaramellino and the E2.0 unitholders, and any reasonable investor, would have viewed as substantially altering the mix of available information regarding the agreement to the Budget and the agreement to the Earn Out provisions in the Merger Agreement.

108.    Had Seibel and Schmaier disclosed the truthful information regarding the failing nature of C3's Enterprise, or C&I, business, the stagnant Enterprise, or C&I, market, and the difficulties with the C3's product and with its customer relations, Scaramellino and the E2.0 unitholders would have been able to properly assess and evaluate whether C3 would allow E2.0 to operate free from interference by C3.

109.    Had Siebel and Schmaier disclosed their pre-existing intent to not allow E2.0 to operate as a stand-alone entity free from interference from C3, but rather to prevent E2.0 from increasing its work force, to close the New York office of E2.0, and to terminate the E2.0 team, then Scaramellino and the E2.0 Unitholders would have never agreed to the Merger.

110.    The truth regarding the omission that the C3 was a failing business and would assign idle C3 personnel to work on E2.0 customers, and terminate E2.0 personnel to save the C3 company from failure, as indicated above by: (i) weekly management reports in late 2011 and the first three months of 2012 (¶¶ 73-76), (ii) interviews with C3 executives Dave Oricco and Joseph Krasko (¶¶ 75-80), and (iii) Siebel's own statements. (¶ 82)

111.    The truth that Siebel and Schmaier never had any intent to allow E2.0 to operate as a stand-alone entity is demonstrated by the fact that days after the merger, Siebel implemented a new business strategy at C3 to abandon any effort at growth in its core business

38

in the Enterprise, or C&I, market and instead pursue growth in E2.0's business in the utility

market and, within several weeks of the Merger, began firing E2.0 personnel, which in several

instances put E2.0 in breach of its contract with its utility customers, cancelling E2.0's contract

with its software programming contractor, and directing Scaramellino not to hire any new

employees.

112.    In addition. Siebel demonstrated that he never intended to allow the E2.0 Business

Unit to operate as a stand-alone entity by immediately taking steps after the Merger to dismantle

the E2.0 operations.

113.    Upon information and belief, defendants knew that each of the above-referenced

representations (¶¶ 96 to 105) regarding the continuation of E2.0 as a stand-alone business were

material and false at the time they made those statements.  Siebel and Schmaier knew during the

Merger negotiations that they did not intend to: (i) permit the former management team at E2.0

to operate the E2.0 Business Unit as a stand-alone business free from interference from

defendants or C3 personnel; (ii) provide capital contributions the E2.0 Business Unit needed to

expand its operations and increase its revenues; (iii) cause C3 to fund the expenditures set forth

in the E2.0 Business Unit Budget which Siebel personally had approved; or (iv) permit the

former E2.0 management team to operate the E2.0 Business Unit in the same manner they had

operated E2.0 prior to the Merger.

114.    Defendants knew during the Merger negotiations that after the Merger they would

not fund the E2.0 Business Unit's expansion in the residential utility market, and would arrange

for C3 personnel to take over control of the E2.0 Business Unit and all communications with its

customers, after which defendants would terminate all the former E2.0 employees and close its

New York City office.

115.     Plaintiffs justifiably relied upon defendants' representations regarding their intent to allow E2.0 management to operate the E2.0 Business Unit as a stand-alone entity, free from interference of defendants, and their intent to cause C3 to fund the operation and expansion of the post-merger E2.0 Business Unit, because plaintiffs and the other E2.0 Unitholders had no reason to believe, or means to ascertain, that defendants were misrepresenting their intent regarding the operations of the post-merger E2.0 Business Unit.  Moreover, the E2.0 Unitholders requested and received both a Letter of Intent, which repeated defendants' representations that E2.0 management would run the post-merger E2.0 Business Unit, and an approved three year E2.0 Business Unit Budget.  The latter showed how the operations of the post-merger E2.0 Business Unit were to be expanded, not contracted, and operated as a stand-alone business out of E2.0's New York office.

**Representations and Omissions**
**Regarding the E2.0 Business Unit Budget**

116.     Inextricably connected to the representations regarding E2.0 continuing as a separate entity with Scaramellino as its manager, was Siebel's agreement to a three year budget for funding the E2.0 Business Unit.  As set forth above at paragraphs 37-40, Scaramellino told Siebel and Schmaier that E2.0 required Siebel to personally commit that he, Siebel, would cause C3 to provide a certain level of resources to fund the expansion of E2.0's operations under a three year budget.  Scaramellino made it clear that he would not enter into the Merger Agreement unless Siebel set forth in an approved budget his own commitment to cause C3 to fund the continuation and expansion of the E2.0 business operations in the residential and SMB utility markets during the three year period of the Earn Out.  Siebel's agreement to cause C3 to fund a three year budget for the E2.0 Business Unit was a condition to Scaramellino's and Blattman's consent to the Merger Agreement.

40

117.    As noted above (¶¶ 37-39), the approved E2.0 Business Unit Budget identified specific capital contributions by C3 to the E2.0 Business Unit in 2013, 2014, and 2015.  Among other things, those contributions by C3 were earmarked for: (i) continuing to employ the entire E2.0 management team and staff working out of E2.0's New York offices; (ii) the hiring of 14 new employees in 2013, an additional six new employees in 2014, and another five new employees in 2015, (iii) funding and maintaining the funding for independent contractor software programmers, as E2.0 management looked to hire internal programmers, and (iv) a commitment to hire a Vice President of Regulatory Affairs, which Scaramellino said was essential for the growth of E2.0's business with regulated utility companies.  Scaramellino, plaintiffs, and the E2.0 Staff who agreed to continue to work for E2.0 after the Merger, all were certain that if the operation and expansion of the E2.0 Business Unit was funded in accordance with the E2.0 Business Unit Budget, then the E2.0 Business Unit would easily achieve the Earn Out goals.

118.    Scaramellino asked that Siebel sign off on, and approve, the E2.0 Business Unit Budget, as modified by Scaramellino and C3's CFO, Howie Shohet.  Siebel did so during the April 17th meeting.

119.    In addition to making the representations set forth above in paragraphs 116 to 118 regarding the purported E2.0 Business Unit Budget, both Siebel and Schmaier also failed to disclose to, and actively concealed from, Scaramellino and the E2.0 Unitholders the information set forth in paragraphs 67 and 71 through 82 above, which reveals that the representation C3 would fund the E2.0 Budget was not possible.  They failed to disclose:

> (i) that, due to the stagnant state of the Enterprise, or C&I, market, C3's difficulties in successfully deploying its software product for its existing customers, the dissatisfaction of C3's customers with the C3 product, and the complaints and payment disputes with those customers, C3 in April 2012 had no resources to

dedicate to the funding of any portion the E2.0 Business Unit Budget (¶ 67 and ¶¶ 74-80); and

(ii) that from the inception of the merger negotiations, Siebel and Schmaier knew they had no intention of ever causing C3 to fund the expansion of E2.0's operations in accordance with the approved E2.0 Business Unit Budget.

120.    Each of these facts that Siebel and Schmaier failed to disclose prior to the Merger was material information that Scaramellino and the E2.0 unitholders, and any reasonable investor, would have viewed as substantially altering the mix of available information regarding the agreement to the Budget and the agreement to the Earn Out provisions in the merger Agreement.

121.    Had Siebel and Schmaier disclosed truthful information regarding the failing nature of C3's Enterprise, or C&I, business, the stagnant Enterprise, or C&I market, and the difficulties with C3's product and with its customer relations, Scaramellino and the E2.0 Unitholders would have been able to properly assess and evaluate whether C3 had any ability to provide the capital funding E2.0 needed and Siebel and Schmaier assured it would get.

122.    Defendants acknowledge the materiality of such information by having actively worked to conceal it from Scaramellino and the E2.0 unitholders.

123.    Had the information that Siebel and Schmaier did not intend to perform the agreement to cause C3 to fund the expansion of the operations of E2.0 been disclosed, Scaramellino and the E2.0 Unitholders would have never agreed to the Merger.

124.    The truth regarding the omission that C3 was unable to fund the E2.0 Business Unit Budget is demonstrated by: (i) the weekly management reports in late 2011 and the first three months of 2012, (ii) interviews with C3 executives Dave Oricco and Joseph Krasko, and (iii) Siebel's own statements.  The weekly management reports and statements of C3 executives (see ¶¶ 74-82) demonstrate that C3's Enterprise, or C&I, business was failing and was not able to

fund the E2.0 Business Budget that Siebel had approved.  Siebel himself admitted in the summer of 2012, only several months after approving the E2.0 Business Unit Budget, that that he was firing C3 employees to "save the company" which Siebel had said would fund the expansion of E2.0 Business Unit.

125.    The truth that Siebel and Schmaier never had any intent to cause C3 to fund E2.0's expansion in accordance with the approved E2.0 Business Unit Budget is demonstrated by the fact that a few days after the merger, Siebel shifted the focus of C3 from the Enterprise, or C&I, market, to the utility market and within several weeks of the Merger was firing E2.0 personnel, cancelling E2.0's contract with its software programming contractor, and directing Scaramellino not to hire any new employees.

126.    In April 2012, when they agreed to cause C3 to fund the expansion of the E2.0 operations, Defendants were aware of the true facts regarding the difficulties in C3's business (see ¶¶ 74-82) and therefore, knew that C3 would not be able to fund the expansion of E2.0 under the approved E2.0 Business Budget.

127.    In addition. Siebel demonstrated that he never intended to fund the E2.0 Business Unit Budget by immediately taking steps after the Merger to dismantle the E2.0 operations and completing this effort with the termination of all E2.0 Business Unit employees and closing the New York office on November 29, 2012.

128.    Scaramellino and the E2.0 Unitholders justifiably relied upon Siebel's promise to cause C3 to fund the E2.0 Business Unit in accord with the Budget he, Siebel, approved, and which covered operations for a three year period.  When Siebel approved the E2.0 Business Unit Budget on April 17th there were no warning signs as to his untrustworthiness.

**Defendants' Representations and Omissions Were
the Result of Defendant's Improper Intent
to Deceive the E2.0 Unitholders**

129.    Defendants intended that plaintiffs rely on their misrepresentations about (i) the

purported attributes driving the $500 million valuation of C3, (ii) the E2.0 Business Unit being

operated by the E2.0 team and existing management as a stand-alone business from E2.0's

offices in New York, and (iii) their intent to fund the expansion of the operations of the E2.0

Business Unit, in accord with the three year Budget approved.  As described above, defendants

had contemporaneous knowledge that their representations about the value and nature of C3's

business were false when they made the representations to Scaramellino, Blattman and the E2.0

Unitholders.  Defendants knowingly concealed material facts regarding the true value of C3 and

the struggling nature of its Enterprise, or C&I, business.  Similarly, as described above,

defendants had contemporaneous knowledge that C3's core business in the Enterprise market

was failing and therefore knew that their representations about C3 funding, but not seeking

control of, the operation of E2.0's business, was not possible.

130.    Moreover, as holders of a substantial percentage of the shares of C3, both Siebel

and Schmaier had a motive to deceive Scaramellino, Blattman and the E2.0 Unitholders

regarding the value and nature of C3's business, the E2.0 Business Unit being operated as a

stand-alone business by the E2.0 team and management from their office in New York, and the

commitment to fund the three year Budget Siebel had approved for the E2.0 Business Unit, in

order to acquire for less than fair value the interest of E2.0 and thereby save C3 from failing.  As

the leaders in the negotiation of the Merger, and due to their access to all of C3's information

about its business, Siebel and Schmaier also had the opportunity to deceive Scaramellino,

Blattman, and the E2.0 Unitholders regarding the value and nature of C3's business, and to

conceal their real plan to interfere with the operation of the E2.0 Business Unit by the former

management of E2.0 and then eliminate the former management of E2.0 from any role in the

operation of the E2.0 Business Unit, and their plan to not fund the E2.0 Business Unit as agreed

to in the E2.0 Business Unit Budget.

**Defendants' Misrepresentations and Omissions
Caused the E2.0 Unitholders to Sustain a
Substantial Loss in their Investment in C3**

131.     But for the false representations of defendants' Siebel and Schmaier set forth

above, plaintiffs would not have agreed to the Merger and the exchange of their E2.0 Units for

shares of C3 class C stock.  In addition, those false representations have caused the substantial

loss to the E2.0 Unitholders in connection with their conversion of their E2.0 Units for Class C

shares of C3.

132.     Plaintiffs have sustained a substantial loss in connection with their delivering their

E2.0 Units to C3 in exchange for Class C shares of C3 because the Class C shares issued to the

E2.0 Unitholders were never worth more than a small fraction of the value represented by

defendants.

133.     When the truth about the attributes of the C3 business that the defendants

concealed during the merger negotiations (¶¶ 67, 74-91) is considered in deriving a valuation of

C3, then the value of the C3 shares issued to the E2.0 Unitholders is far less than (i) the value of

the C3 shares that defendants represented to the E2.0 Unitholders and (ii) the value of the E2.0

Units given in exchange for those C3 shares.  Specifically, as a result of the fraud, the C3 shares

issued to the E2.0 Unitholders at the closing were worth less than one-third of the $23.75 million

value that defendants represented and defendants caused plaintiffs and the other E2.0

Unitholders to sustain a loss of at least $16 million and likely more with respect to those shares.

134.    In addition, the E2.0 Unitholders have sustained a substantial loss in connection with their not receiving the "Earn Out" of additional Class C shares.  In July 2013, C3 sent to the E2.0 Unitholders a notice that the E2.0 Business had not met the minimum revenue threshold for fiscal year 2013 set forth in the Earn Out provisions of the Merger Agreement, and therefore, C3 would not be issuing any additional Class C shares to the E2.0 Unitholders for that year.

135.    Likewise in July 2014, C3 sent to the E2.0 Unitholders a notice that the E2.0 Business had not met the minimum revenue threshold for fiscal year 2014 set forth in the Earn Out provisions of the Merger Agreement and therefore, C3 would not be issuing any additional Class C shares to the E2.0 Unitholders for that year.

136.    The loss plaintiffs and the E2.0 Unitholders sustained in connection with the "Earn Out" shares they have not received in fiscal year 2013 and 2014 was attributable to the fraudulent conduct of defendants as alleged in paragraphs 95 through 128.

137.    In a seven month period following the Merger, Siebel took control of the E2.0 Business Unit, prevented Scaramellino and other former E2.0 employees from communicating with the current and potential customers of E2.0, refused to fund the approved and budgeted hirings of employees and consultants needed at the E2.0 Business Unit, prevented the former management of E2.0 from managing the E2.0 Business Unit, prevented E2.0 from employing the same marketing plan and pursuing sales of the same products E2.0 had employed and sold prior to the Merger, fired all the former employees of E2.0, and then shut down the E2.0 Business Unit's New York office.

138.    As a direct result of this interference by Siebel, the E2.0 Business Unit generated less revenue than it otherwise would have generated if the former E2.0 employees had been

permitted to pursue business from E2.0's customers and from potential new customers through the E2.0 business pipeline.

139.    Upon information and belief, Siebel engaged in this interference in the operations of the E2.0 Business Unit to prevent its former management from achieving the revenue thresholds that would trigger the issuance of the Earn Out shares to the E2.0 Unitholders.

## FIRST CLAIM FOR RELIEF – FRAUD

### Violations of Section 10(b) and Rule 10b5 thereunder of the Exchange Act [15 U.S.C. § 78j(b); 17 C.F.R. § 240. 10b-5]

140.    Paragraphs 1through 139 are re-alleged and incorporated by reference herein.

141.    All defendants, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, or of the mails, with scienter, in connection with the purchase of securities (the E2.0 Units) and the sale of securities (Class C shares of C3) (a) have employed manipulative and deceptive devises, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operated as a fraud and deceit upon plaintiffs.

142.    These devices, schemes and artifices, untrue statements and omissions of material facts, practices, and course of business are set forth in paragraphs 1 through 139.

143.    Defendants acted knowingly with respect to the activities alleged herein.  The representations set forth above were fraudulent and known to be untrue at the time made by defendants.  The omitted information set forth above was knowingly concealed from plaintiffs. Defendants made those statements, and concealed that information, to mislead the E2.0

Unitholders and induce them to surrender their ownership interests in E2.0 in exchange for Class C shares of C3.

144.    The E2.0 Unitholders believed the misrepresentations, and were unaware of the omitted information set forth above, and justifiably relied upon those misrepresentations and omissions in agreeing to surrender their ownership interests in E2.0 in exchange for Class C shares of C3.

145.    By reason of the foregoing defendants have violated Section 10(b) of the Exchange Act and Rule 10(b)-5.

146.    As a result of defendants' fraudulent acts, plaintiffs and the other E2.0 Unitholders have been damaged in an amount to be determined at trial, but which is not less than $48,750,000.

**SECOND CLAIM FOR RELIEF**
**[Intentional Fraudulent Misrepresentations and Omissions]**

147.    Plaintiffs re-allege the allegations set forth in paragraphs 1 through 139 as if fully set forth herein.

148.    During the course of the Merger negotiations, the Defendants made to plaintiffs and the other E2.0 Unitholders the material representations, and concealed the material information, set forth above.

149.    Defendants' representations made during the Merger negotiations and in connection with the exchange of E2.0 Units for C3's Class C shares were knowingly false at the time they were made, and the information defendants failed to disclose and concealed during the Merger negotiations was material and knowingly misleading.

150.    Upon information and belief, defendants by their false statements and omissions intended to deprive the E2.0 Unitholders of the fair value of their company.

151.    Defendants' made the misrepresentations and omissions described above with the intent to defraud and mislead plaintiffs and the other E2.0 Unitholders by inducing them to agree to a merger of E2.0 with a wholly owned subsidiary of C3 in which they surrendered their ownership interests in E2.0 in exchange for Class C shares of C3.

152.    Plaintiffs and the other E2.0 Unitholders believed the truth of the representations described above, were not aware that those representations were untrue, and were not aware of the truth regarding the omitted information described above.

153.    Plaintiffs and the other E2.0 Unitholders reasonably relied upon said misrepresentations and omissions, and as a direct and proximate cause of Defendants' misrepresentations and omissions, plaintiffs and the other E2.0 Unitholders surrendered their ownership interests in E2.0 in exchange for Class C shares of C3.

154.    As a consequence of defendants' misconduct, plaintiffs and the E2.0 Unitholders have been damaged in an amount to be determined at trial, but which is not less than $48,750,000.

155.    Defendants' conduct and fraud was of such a nature as to evince a high degree of moral turpitude and wanton dishonesty as to imply a criminal indifference to civil obligations.

156.    As a consequence of the foregoing outrageous and wanton conduct, plaintiffs are entitled to the return of, or the disgorgement of, all profits or benefits defendants had derived or enjoyed as a result of the Merger Agreement.

## THIRD CLAIM FOR RELIEF
### [Breach of Contract]

157.    Plaintiffs re-allege the allegations set forth in paragraphs 1 through 43, and 116 through 118, as if fully set forth herein.

158.    Siebel promised Scaramellino that he would cause C3 to fund the E2.0 Business Unit in the years 2013, 2014, and 2015 in accordance with an operating budget that he, Siebel, had approved.  Scaramellino had informed Siebel on April 17, 2012 that he would not agree to the Merger unless Siebel agreed to cause the funding by C3.  The funding commitment was necessary to give the Unitholders a realistic chance to obtain the $25 million in Earn Out payments provided for in the Merger Agreement.

159.    On April 17, 2012, Siebel approved the Budget, and assured Scaramellino that the E2.0 Business Unit would have full authority to operate according to the three year Budget Siebel approved.  With this assurance, Scaramellino agreed to the Merger Agreement.

160.    Siebel in breach of his agreement with Scaramellino did not cause C3 to fund the E2.0 Business Unit as provided in the E2.0 Business Unit Budget.  On the contrary, he caused the E2.0 Business Unit to go out of business, due in large measure to the lack of funding, and to close the New York office by November 29, 2012.

161.    As a consequence of Siebel's breach of his promise to Scaramellino to cause C3 to fund the E2.0 Business Unit Budget, Scaramellino and the Unitholders lost their opportunity to Earn Out additional Units.

WHEREOF, Plaintiffs respectfully request judgment against the defendants as follows:

a)  Damages in the amount to be determined at trial, but which is not less than $48,750,000, together with pre-judgment interest;

b)  All profits, benefits or distributions enjoyed by defendants as a result of the merger with E2.0;

c)  The cost and disbursements of this action; and

d)  Such further and other relief as the Court may deem to be just and proper.

Dated:   New York, New York
        March 17, 2015

                        Tibbetts, Keating & Butler, LLC
                        Attorneys for Plaintiffs

                        By: ___s/ David J. McCarthy_____
                              Timothy F. Butler, Esq.
                              David J. McCarthy, *Of Counsel*
                              Nine East 45th Street, Ninth Floor
                              New York, New York 10017
                              (212) 629-4119