IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ERIC BLATTMAN, individually and as an assignee of certain former members of E2.0 LLC, LAMB FAMILY LLC, and DAVID STAUDINGER, | ) ) ) ) ) | |
| Plaintiffs / Counterclaim-Defendants, | ) ) | |
| v. | ) ) | Civ. No. 15-530-GMS Consolidated with |
| THOMAS M. SIEBEL, DAVID SCHMAIER, JOHN DOE 1, and JOHN DOE 2, | ) ) ) | Civ. No. 16-750-GMS |
| Defendants / Counterclaim-Plaintiffs. | ) ) ) | |
| C3, INC. d/b/a C3 IoT, | ) ) ) | |
| Plaintiff / Counterclaim-Defendant, | ) ) | |
| v. | ) ) ) | |
| ERIC BLATTMAN, individually and as an assignee of certain former members of E2.0 LLC, LAMB FAMILY LLC, and DAVID STAUDINGER, | ) ) ) ) ) | |
| Defendants / Counterclaim-Plaintiffs. | ) | |

Joanne P. Pinckney, Esquire and Seton C. Mangine, Esquire of Pinckney, Weidinger, Urban and Joyce LLC, Greenville, Delaware. Counsel for Eric Blattman, Lamb Family LLC, and David Staudinger. Of Counsel: Timothy F. Butler, Esquire, David J. McCarthy, Esquire, and Thomas B. Noonan, Esquire of Tibbetts, Keating & Butler, LLC, New York, New York, and Stephen D. Raber, Esquire, Jonathan M. Landy, Esquire, and John McNichols, Esquire of Williams & Connolly LLP, Washington, D.C.

Kenneth J. Nachbar, Esquire and Lauren K. Neil, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for C3, Inc. Of Counsel: Michael B. Carlinsky, Esquire, Joseph Milowic III, Esquire, John H. Chun, Esquire, and Clinton Dockery, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York.

**MEMORANDUM OPINION**

SLEET, District Judge

## I.   INTRODUCTION

Eric Blattman, Lamb Family LLC, and David Staudinger owned interests in Efficiency 2.0 LLC ("E2.0") before its merger with C3, LLC, now C3, Inc. ("C3"). (D.I. 28 ¶ 41). Thomas Siebel ("Siebel") and David Schmaier ("Schmaier") are the Chief Executive Officer and Chief Operating Officer of C3, respectively. This case consolidates two actions that are essentially mirror opposites: Civ. No. 15-530-GMS, referred to as the "Blattman Action," and Civ. No. 16-750-GMS, referred to as the "C3 Action." The plaintiffs and claims in one case are essentially the defendants and counterclaims in the other case. The only pertinent difference between the two actions is that officers of C3 (Siebel and Schmaier) are the defendants/counterclaim-plaintiffs in the Blattman Action, but C3 alone is the plaintiff/counterclaim-defendant in the C3 Action.

Pending before the court is a motion filed by C3 to dismiss the counterclaims in the C3 Action. (D.I. 125). Also pending before the court is a motion filed by Eric Blattman, Lamb Family LLC, and David Staudinger to amend/correct their complaint in the Blattman Action. (D.I. 127). The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 15 U.S.C. § 78aa (jurisdiction for violations of the Exchange Act), and 28 U.S.C. § 1332 (diversity of citizenship). For the following reasons, the motion to dismiss is granted in part and denied in part, and the motion to amend is granted.

## II.   BACKGROUND

### A.   Procedural History

The parties have reached this point through a tortured procedural history, which the court reduces to the following essential facts. On October 28, 2014, Eric Blattman, Lamb Family LLC, and David Staudinger (the "Plaintiffs") sued Siebel and Schmaier (the "Defendants") in the U.S.

1

District Court for the Southern District of New York for securities fraud and common law fraud based on events related to the merger transaction in which C3 acquired E2.0 (the "Blattman Action").[1] (D.I. 1). C3 was not named as a party in that action. (*Id.*). Plaintiffs amended the complaint on March 27, 2015 to add a breach of contract claim based on Defendants failure to cause C3 to fund E2.0's three-year budget, thereby hindering E2.0's ability to achieve an earnout provided for in the merger agreement. (D.I. 28 ¶ 158). On June 16, 2015, the New York court granted Defendants' motion to transfer the Blattman Action to this court based on the forum selection clause in the merger agreement. (D.I. 44). On April 12, 2016, this court granted Defendants' motion to dismiss Plaintiffs' breach of contract claim based on an integration clause in the merger agreement, but denied Defendants' motion to dismiss the fraud claims. (D.I. 65).

In June 2016, Defendants answered the complaint and asserted counterclaims, later amended, for securities fraud, common law fraud, breach of contract, recoupment, and attorneys' fees.[2] (D.I. 69, D.I. 71). Shortly thereafter, C3 moved to intervene in the Blattman Action. (D.I. 79). Nevertheless, on August 25, 2016, before the court could rule on the motion to intervene, C3 initiated its own action against Plaintiffs (the "C3 Action") asserting claims that were identical to Defendants' counterclaims in the Blattman Action. (C3 Action D.I. 1). The court consolidated the Blattman Action and the C3 Action. (D.I. 92).

On October 22, 2016, Plaintiffs answered C3's complaint and asserted counterclaims for securities fraud, common law fraud, and breach of contract. (D.I. 120). The fraud counterclaims

---

[1]    To avoid confusion, the court will continue to refer to Eric Blattman, Lamb Family LLC, and David Staudinger as the "Plaintiffs" and Siebel and Schmaier as the "Defendants," even when referring to arguments, claims, and defenses raised in the C3 Action where Eric Blattman, Lamb Family LLC, and David Staudinger are technically the defendants/counterclaim-plaintiffs.

[2]    These counterclaims are subject to a pending motion for a judgment on the pleadings which has not been fully briefed. (D.I. 85).

2

against C3 are identical to the fraud claims against Defendant. (*Id.*). The breach of contract counterclaims relate to the distribution of "Holdback Units" and the achievement of an earnout. (*Id.* at ¶¶ 161-67). Specifically, Plaintiffs allege that C3 breached its obligations in the merger agreement to: (1) distribute the Holdback Units by November 1, 2013; (2) not engage in any bad-faith interference with an Earnout achievement; and (3) deliver Earnout Notices at the end of the 2013, 2014, and 2015 fiscal year that properly reported profit and revenue. (*Id.*). On March 29, 2017, C3 voluntarily dismissed its claims in the C3 Action, leaving only Plaintiffs' counterclaims at issue in that action. (D.I. 180). This procedural development does not change the court's analysis. (D.I. 180).

### B.    Factual Background

On May 1, 2012, E2.0, C3, and Thomas Scaramellino, as Securityholder Representative of E2.0's unitholders, executed a merger agreement pursuant to which C3 acquired Plaintiffs interests in E2.0, and E2.0 merged with a wholly owned subsidiary of C3. (D.I. 28 ¶ 41). Section 1.4 of the merger agreement provided for an earnout under which Plaintiffs could receive over the next three years additional C3 Class C shares purportedly worth $25 million depending on the extent to which the E2.0 subsidiary of C3 attained certain minimum revenue and maximum loss targets (an "Earnout Event"). (*Id.* at ¶ 43). The same section of the merger agreement provided that, until March 31, 2015, C3 would not take "any action in bad faith whose purpose is to intentionally minimize or intentionally interfere with the achievement of any Earnout Event." (D.I. 120 ¶ 163). To determine if an Earnout Event occurred, C3 was obligated to deliver within 120 days of the end of the 2013, 2014, and 2015 fiscal year a written "Earnout Notice" specifying E2.0's revenue and profits for that year, and whether any Earnout Units would be paid. (*Id.* at ¶ 165).

3

C3 delivered Earnout Notices for 2013 and 2014, which Plaintiffs allege misrepresented E2.0's revenue and profit. (*Id.* at ¶ 166). For 2015, C3 failed to deliver any Earnout Notice at all. (*Id.* at ¶ 167). In addition, Plaintiffs allege that C3 interfered in bad faith with the achievement of an Earnout Event. (*Id.* at ¶¶ 163-64). Specifically, C3 deliberately failed to support the E2.0 subsidiary, siphoned its assets for the pursuit of C3's business, and wrongfully manipulated E2.0's earnings. (D.I. 134 at 4-5). For example, in November 2012, C3 terminated the employees and closed the offices of the E2.0 subsidiary. (D.I. 28 ¶ 127). C3 also "failed to honor the approved budget for the E2.0 Business." (*Id.* at ¶ 164).

Under Section 1.2 of the merger agreement, C3 was permitted to retain Holdback Units from the number of shares delivered to Plaintiffs upon closing, but C3 had to issue the Holdback Units to Plaintiffs on a pro rata basis within 18 months of closing, as long as C3 had not given the Securityholder Representative a Notice of Indemnification Claim (the "Indemnification Notice"). (*Id.* at ¶ 161). Accordingly, C3 had until November 1, 2013 to issue the Holdback Units. Instead, on October 4, 2013, C3 sent Plaintiffs an Indemnification Notice explaining that, due to breaches of E2.0's representations and warranties in the merger agreement regarding its business pipeline, software defects, and source code, C3 had incurred an indemnification claim for an amount in excess of the Holdback Units and, therefore, would not be distributing any Holdback Units to Plaintiffs. (D.I. 120 ¶ 162, D.I. 126-2). The breaches outlined in the Indemnification Notice form the basis of Defendants' counterclaims and C3's claims. (D.I. 71, C3 Action D.I. 1).

## III. STANDARD OF REVIEW

### A. Motion to Dismiss

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,

4

677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Fed. R. Civ. P. 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 545 (internal punctuation and quotation marks omitted). Although "[d]etailed factual allegations" are not required, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. When considering a Rule 12(b)(6) motion, the court accepts "as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).

### B.    Leave to Amend

Whether to grant or deny a motion for leave to amend is within the district court's discretion. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Fed. R. Civ. P. 15(a)(2) provides that leave to amend a party's pleading should be freely given "when justice so requires." The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 486–87 (3d Cir. 1990). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

## IV.    DISCUSSION

In the C3 Action, Plaintiffs assert three counterclaims: (1) securities fraud, (2) common law fraud, and (3) breach of contract based on C3's obligation to distribute the Holdback Units, not engage in any bad-faith interference with an Earnout achievement, and deliver Earnout Notices at the end of the 2013, 2014, and 2015 fiscal year. (D.I. 120 ¶¶ 161-67). Plaintiffs have moved to

amend/correct their complaint, which would add C3 as a defendant and the breach of contract counterclaims as claims to the Blattman Action. (D.I. 127). C3 opposes the motion to amend and has moved to dismiss the counterclaims based on the same arguments. (D.I. 125, D.I. 135). According to C3, all of the counterclaims (except breach of contract based on the Earnout Notices) are untimely under the applicable statute of limitations. (D.I. 126 at 14-17). If the court finds that the fraud counterclaims are not untimely, C3 argues that they should still be dismissed pursuant to a general release executed by Plaintiffs. Finally, C3 argues that the breach of contract counterclaim based on the Earnout Notices is precluded by a binding arbitration provision in the merger agreement. Each of these arguments are addressed in turn.

### A.    Statute of Limitations

C3 argues that all of Plaintiffs' counterclaims (except breach of contract based on the Earnout Notices) should be dismissed as untimely. (D.I. 126). Plaintiffs filed their counterclaims against C3 on October 22, 2016. (D.I. 120). According to C3, however, the statute of limitations expired in December 2014 for securities fraud, December 2015 for common law fraud, October 4, 2016 for breach of contract related to the Holdback Units, and November 2015 for breach of contract related to bad faith interference with an Earnout Event. (D.I. 126 at 2, 16-17). Plaintiffs argue that their counterclaims are not untimely, because they are either compulsory counterclaims or relate back to the pleadings in the Blattman Action. (D.I. 134 at 8-9, D.I. 136 at 4-6).

### 1.    Compulsory Counterclaim

Plaintiffs counterclaimed that C3 breached the merger agreement when it failed to issue the Holdback Units within 18 months of closing. (D.I. 120 ¶¶ 161-62). According to Defendants, this counterclaim is subject to a three-year statute of limitations that began to accrue on October 4, 2013, when C3 sent Plaintiffs an Indemnification Notice stating that it would not be distributing

any Holdback Units. (D.I. 126 at 15). If correct, then Plaintiffs' counterclaim filed on October 22, 2016 was late unless a tolling doctrine applied. (*Id.*). Plaintiffs argue that the counterclaim is a compulsory counterclaim and, therefore, the limitations period was tolled upon the filing of C3's complaint on August 25, 2016. (D.I. 134 at 8).

"The majority view in federal court is that 'the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim.'" *Kickflip, Inc. v. Facebook, Inc.*, 2015 WL 1517237, at *5 (D. Del. Mar. 31, 2015) (quoting *Giordano v. Claudio*, 714 F. Supp. 2d 508, 523 (E.D. Pa. 2010). The Federal Rules of Civil Procedure define a compulsory counterclaim as one which "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). "[W]hen one party to a contract puts provisions of it at issue . . . all actions taken pursuant to that contractual relationship become part of the relevant transaction or occurrence." *Matrix Grp., Inc. v. Ford Motor Credit*, 2004 WL 2742835, at *3 (E.D. Pa. Nov. 29, 2004).

In its complaint, C3 claims that Plaintiffs breached the representations and warranties in the merger agreement regarding E2.0's business pipeline, software defects, and source code. (C3 Action D.I. 1 ¶¶ 33-50, 82-87). The same breaches formed the basis of the indemnification claim that C3 said in its Indemnification Notice exceeded the value of the Holdback Units. (D.I. 120 ¶ 162, D.I. 126-2). If the court finds that Plaintiffs did not breach the representations and warranties in the merger agreement, then C3 did not incur an indemnification claim that exceeded the value of the Holdback Units, and C3 breached the merger agreement by not issuing the Holdback Units to Plaintiffs. Accordingly, Plaintiffs breach of contract counterclaim based on the Holdback Units is a compulsory counterclaim that arises out of the same transaction or occurrence that is the subject matter of C3's breach of contract claim, making Plaintiffs' counterclaim timely as it relates

7

back to the filing of C3's complaint. C3's motion to dismiss the breach of contract counterclaim based on the Holdback Units as time barred is denied.

### 2. Relation Back

The court finds that the remaining counterclaims subject to C3's statute of limitations defense (fraud and breach of contract based on bad faith interference) are not untimely, because they relate back to the claims in the Blattman Action. As an initial matter, C3 relies on *U.S. ex rel. Malloy v. Telephonics Corp.* for the proposition that Rule 15(c) "does not permit a complaint filed in one civil action to relate back to a complaint filed in a separate civil action." 68 F. App'x 270, 273 (3d Cir. 2003). *Malloy*, however, is distinguishable. Plaintiff in that case tried to avoid a statute of limitations defense by relating two separate *qui tam* actions he initiated against the same defendant using the same complaint. *Id.* at 272. Here, Plaintiffs did not initiate two separate civil actions. Instead, they are plaintiffs in the Blattman Action and defendants/counterclaim-plaintiffs in the C3 Action. Moreover, if permitted to amend their complaint, Plaintiffs' claims would relate back to a pleading in the same civil action. Given the unusual procedural context of this case, the court finds that *Malloy* does not apply.

Under Fed. R. Civ. P. 15(c)(1)(A), "[a]n amendment to a pleading dates back to the date of the original pleading when . . . the law that provides the applicable statute of limitations allows relation back." The purpose of this provision is to permit a party to avail itself of any relation-back principle allowed by state law. *DeRienzo v. Harvard Indus., Inc.*, 357 F.3d 348, 353 n. 8 (3d Cir. 2004) ("Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in [Rule 15(c)(1)], it should be available to save the claim." (quoting Fed. R. Civ. P. 15 advisory committee's note to 1991 amendment). Under Delaware law, a court may grant leave to amend a complaint that adds a new party and

8

allow those claims to relate back to the date of the original filing if: (1) the claims asserted in the amended pleading arises from the conduct, transaction, or occurrence advanced in the original pleading; (2) the new party in the amended pleading received adequate notice of the action so as not to be prejudiced in maintaining a defense on the merits; (3) the new party knew or should have known that the action would have been brought against it but for a mistake; and (4) the notice and knowledge factors were satisfied within the period prescribed for service of process. *Wilson v. Consumers Life Ins. Co.*, 2000 WL 1211169, at *2 (Del. Super. Aug. 1, 2000); *Dobson v McKinley*, 2009 WL 891056, at *3 (Del. Super. Mar. 31, 2009).

C3 argues that there can be no mistake that satisfies the third prong, because Plaintiffs knew C3's identity since the beginning and undertook a deliberate litigation strategy of suing only C3's officers and not C3.[3] (D.I. 135 at 15). Delaware courts have permitted relation back under these circumstances where "the party to be added is no stranger to the litigation, is actively involved in defending a third-party complaint, and is thus already a party in the case." *Dobson*, 2009 WL 891056, at *4. The courts have reasoned that permitting the amendment and relation back "will actually simplify the case for trial, make the presentation to the jury more sensible, help prevent a verdict based on hyper-technical form grounds, and give a genuine focus to the substance of the dispute." *Wilson*, 2000 WL 1211169, at *3.

Here, C3 is not defending a third-party complaint, but it is certainly no stranger to the Blattman Action. Instead, C3's officers are the named defendants, C3 sought to intervene, C3 has

---

[3]     According to C3, Plaintiffs named only Siebel and Schmaier as defendants in the Blattman Action, because only C3 was a signatory to the merger agreement and, therefore, Siebel and Schmaier could not claim its protections and benefits. (D.I. 135 at 13). The court notes, however, that Siebel and Schmaier have successfully invoked the provisions of the merger agreement to have the Blattman Action transferred to this court and have the breach of contract claim dismissed. (D.I. 44, D.I. 65)

9

asserted claims against Plaintiffs that are identical to the counterclaims Defendants asserted against Plaintiffs, and Plaintiffs have asserted fraud counterclaims against C3 that are identical to the fraud counterclaims against Defendants. Although Plaintiffs may have tried to gain a litigation advantage by not naming C3 a defendant in their initial complaint, C3 has engaged in similar behavior by avoiding the court's decision on the motion to intervene and instead filing a mirror opposite civil action. By granting Plaintiffs leave to amend and finding that the claims against C3 relate back to claims against Defendants, the court can address the substance of the claims and avoid a verdict based on hyper-technical form grounds.

Finally, the court finds C3's reliance on *Garvin v. City of Philadelphia* and its progeny misplaced. *(See* D.I. 135 at 15). C3 relies on language in *Garvin* where the Third Circuit stated, "Of course, an amended complaint will not relate back if the plaintiff had been aware of the identity of the newly named parties when she filed her original complaint and simply chose not to sue them at that time." 354 F.3d 215, 221–22 (3d. Cir. 2003). In *Garvin*, a plaintiff sought to amend her pleading to substitute the John Doe placeholder defendants with the names of four police officers. *Id.* at 218. Here, Plaintiffs are not trying to substitute John Doe placeholders but add an entity as defendant to a complaint that already names its officers as defendants.

Under Third Circuit precedent, a complaint that names as defendants only officers in their official capacity is treated as also having named the entity as a defendant. *See Johnson v. Doe*, 2014 WL 1681988, at *5 (E.D. Pa. Apr. 29, 2014) ("The 'practical effect' of charging 'official defendants with liability in their official capacity' is to charge the entity with liability.'" (quoting *Giuffre v. Bissell*, 31 F.3d 1241, 1247 n. 6 (3d Cir. 1994)). Thus, in *Ferencz v. Medlock*, another case on which C3 inaptly relies, the court held that the plaintiff did, in fact, name the entity as a defendant in her original complaint when she sued only the individual defendants in their official

10

capacities. 905 F. Supp. 2d 656, 668 (W.D. Pa. 2012). These cases show that *Garvin* is not applicable here. Accordingly, Plaintiffs counterclaims against C3 for fraud and breach of contract based on bad faith interference are not untimely, because they relate back to the date of the original filing in the Blattman Action, which was before the statute of limitations expired. C3's motion to dismiss these counterclaims on statute of limitations grounds is denied.

## B.    General Release

C3 argues that even if the fraud claims are not time-barred, they should still be dismissed because Plaintiffs executed a Unitholder Joinder, Release and Lock-up Agreement (the "Release Agreement") a few days before the merger agreement that expressly released those claims. (D.I. 126 at 13). As a general rule, the court may not consider on a motion to dismiss matters extraneous to the pleadings. *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 97 n. 6 (3d Cir. 2010). An exception exists for documents "integral to or explicitly relied upon in the complaint." *Id.* The Release Agreement does not fall within any exception. Accordingly, the court cannot address this argument at this stage of the proceedings. C3's motion to dismiss the fraud claims based on the Release Agreement is denied.

## C.    Binding Arbitration

C3 argues that the breach of contract counterclaim based on the Earnout Notices must be dismissed, because the merger agreement compels arbitration of that dispute. (D.I. 126 at 17-18). Specifically, the merger agreement requires Plaintiffs' Securityholder Representative to object to the Earnout Notice within twenty days of receipt. (*See* D.I. 35-1, at § 1.4(a)(iii)). The objection "shall specify those items or amounts as to which the Securityholder Representative disagrees, and the Securityholder Representative shall be deemed to have agreed with all other items and amounts contained in the applicable Earnout Notice, including the computation of any Earnout Payment."

11

(*Id.*). "If the parties are unable to resolve their differences . . . , the matter shall be promptly referred to a mutually satisfactory independent accounting firm (such selected firm being the 'Earnout Independent Expert')." (*Id.*). Any "resolution of disputed items by the Earnout Independent Expert shall be final and binding on [C3], the Securityholder Representative and the Unitholders and the determination of the Earnout Independent Expert shall constitute an arbitral award that is final, binding and non-appealable and upon which a judgment may be entered by a court having jurisdiction thereover." (*Id.*).

The court finds that the breach of contract counterclaim based on the Earnout Notices is subject to the arbitration provision. Plaintiffs alleged that, for 2013 and 2014, C3 delivered an Earnout Notice "that intentionally and knowingly did not properly report the Company Business Unit Revenue and Company Business Unit Profit for fiscal year 2013 and 2014." (D.I. 120 ¶ 166). The Delaware Supreme Court has stated, "If the subject matter to be arbitrated is the calculation of an earn-out, or the amount of working capital, or the company's net worth at closing, all issues as to what financial or other information should be considered in performing the calculation are decided by the arbitrator." *Viacom Intern., Inc. v. Winshall*, 72 A.3d 78, 83 (Del. 2013). Accordingly, the arbitrator can decide whether C3 properly included or excluded certain amounts in its calculation of Company Business Unit Revenue and Company Business Unit Profit for fiscal year 2013 and 2014. Plaintiffs have not provided any authority supporting their argument that the arbitration provision does not apply because C3 may have "intentionally" calculated the Earnout Notices incorrectly. (D.I. 134 at 9-10). To the extent Plaintiffs are arguing that the Earnout Notices were incorrect because C3 intentionally degraded E2.0's business, Plaintiffs have already asserted that claim by alleging breach of contract based on bad-faith interference with an Earnout achievement. (D.I. 136 at 9).

The breach of contract claim based on the 2015 Earnout Notice is in a somewhat different position, because C3 never delivered a 2015 Earnout Notice to Plaintiffs. (D.I. 120 ¶ 167). Thus, an argument can be made that the arbitration provision in the merger agreement was never triggered. However, allowing the breach of contract claim based on the 2015 Earnout Notice to remain a part of this litigation would further exacerbate the parties' tortured procedural history. Moreover, the Delaware Supreme Court stated in *Viacom* that the arbitrator—and not the court— can decide whether a late closing statement could be taken into consideration. *Viacom*, 72 A.3d at 83. This language suggests that the arbitrator can decide whether a belated 2015 Earnout Notice—which the court assumes C3 will now deliver—can be taken into account in rendering a decision.[4] Accordingly, the court grants C3's motion to dismiss the breach of contract claim based on the Earnout Notices.

## V.   CONCLUSION

For the foregoing reasons, C3's motion to dismiss is granted in part and denied in part. (D.I. 125). The motion is granted as to the breach of contract counterclaim based on the Earnout Notices and denied as to all other counterclaims. C3 moved to dismiss Plaintiffs counterclaims and opposed Plaintiffs' motion to amend on the same grounds. Accordingly, Plaintiffs' motion for leave to amend the complaint is granted to the extent the claims were not dismissed. (D.I. 127). An appropriate order will be entered.

Dated: March 31, 2017

UNITED STATES DISTRICT JUDGE

---

[4]     Plaintiffs have not requested specific performance ordering C3 to deliver the 2015 Earnout Notice. (*See* D.I. 120 ¶¶ 165-68 & Prayer for Relief). If that were the case, there may be an argument—which the parties did not raise—that equitable relief is an issue for the court and not the arbitrator.