# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ERIC BLATTMAN, individually and<br>as an assignee of certain former<br>members of E2.0 LLC, LAMB<br>FAMILY LLC and DAVID<br>STAUDINGER, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 15-530-CFC |
| THOMAS M. SIEBEL,<br>DAVID SCHMAIER, JOHN DOE 1<br>and JANE DOE 2, | ) ) ) ) | **CONSOLIDATED** |
| Defendants, | ) ) ) | |
| C3, INC. d/b/a C3 IoT,<br>    Defendant,<br>    Counterclaim Defendant. | ) ) ) ) | |

Timothy Jay Houseal, William E. Gamgort, YOUNG CONAWAY STARGATT &
TAYLOR, LLP, Wilmington, Delaware; Stephen D. Raber, Jonathan M. Landy,
John McNichols, Kyle E. Thomason, Brian P. Hagerty, WILLIAMS &
CONNOLLY LLP, Washington, District of Columbia; Timothy F. Butler, David J.
McCarthy, Thomas B. Noonan, TIBBETTS, KEATING & BUTLER, LLC, New
York, New York

*Counsel for Plaintiffs/Counterclaim Plaintiffs*

Kenneth J. Nachbar, Lauren Neal Bennett, MORRIS, NICHOLS, ARSHT &
TUNNELL LLP, Wilmington, Delaware; Michael B. Carlinsky, Edward J.
DeFranco, Joseph Milowic III, John H. Chun, Jesse Bernstein, QUINN
EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Kevin

P.B. Johnson, Michael T. Lifrak, David E. Myre, QUINN EMANUEL
URQUHART & SULLIVAN, LLP, Redwood Shores, California

*Counsel for Defendants and Defendant/Counterclaim Defendant*

## **MEMORANDUM OPINION**

January 29, 2020
Wilmington, Delaware

_____
COLM F. CONNOLLY,
UNITED STATES DISTRICT JUDGE

As required by Federal Rule of Civil Procedure 52(a)(1), I have set forth separately below my findings of fact and conclusions of law after a seven-day bench trial in this consolidated fraud and breach-of-contract action.

The three claims tried by the parties were alleged in two pleadings. The first pleading is the Second Amended Complaint filed by Plaintiffs Eric Blattman, Lamb Family LLC, and David Staudinger against Defendants C3, Inc., Thomas Siebel, and David Schmaier. D.I. 190. There are three claims for relief in this pleading: (1) a claim of securities fraud under 15 U.S.C. § 78j(b) and 17 C.F.R. § 10b-5 alleged against all three Defendants; (2) a claim of common law fraud alleged against all three Defendants; and (3) a breach of contract claim alleged against C3. The second operative pleading is Plaintiffs' Answer and Counterclaims, D.I. 120, filed in response to claims brought in a complaint that was filed and later dismissed by C3 against Plaintiffs. The counterclaims in this second pleading are substantively identical to Plaintiffs' claims in the Second Amended Complaint. Plaintiffs say they have not dismissed these counterclaims because of certain statute of limitations defenses raised by Defendants.

# FINDINGS OF FACT

## I.    General Background

This case arises out of the 2012 stock-for-stock merger of two start-up companies: C3 and Efficiency 2.0, LLC.[1]  Both companies were founded in 2009—E2.0 by Blattman and non-party Thomas Scaramellino; C3 by Siebel.  Tr. 716:1–4.  Both companies created software and services to help customers gain visibility into their energy expenditure and take actions to achieve energy savings. E2.0 initially designed software products and savings-reward programs for use by residential customers of utility companies.  C3, by contrast, initially focused on developing products for large commercial and industrial companies—the so-called "C&I" market.  At the end of 2011 and into the early part of 2012, both C3 and E2.0 began to develop and market energy-saving software and programs for small-to-medium-sized businesses (the SMB market).  E2.0 sold its products and services through contracts it had with utility companies.  C3 initially sold its products and services directly to companies such as General Electric, Dow, and Cisco; but by late 2011, it began to change to a business model like E2.0's that made indirect sales of its products and services through utility companies.  PX-46.002.

---

[1] Throughout this litigation, the parties used interchangeably "stock," "unit," and "share" and used interchangeably "stockholder," "unitholder," and "shareholder." I will therefore do the same.

Scaramellino served as E2.0's CEO from its inception through the merger with C3. Tr. 268:1–12, 716:5–8. Blattman was E2.0's largest investor and chairman. Tr. 1498:7–1499:1. Blattman first learned about Scaramellino's involvement in the energy-savings software business in the 2008 time frame from Scaramellino's father, whom Blattman had known since kindergarten. Blattman had enjoyed a successful Wall Street career at four investment banks before founding the hedge fund Maple Row Partners, where he managed nearly a half a billion dollars from 1996 to 2003. DTX-018.1; Tr. 1500–1502. He had, in his own words, "invested in thousands of companies," Tr. 1504:15–17; and he worked with Scaramellino to form what became E2.0 in 2009. Blattman testified that he invested a total of "[s]omewhere between two-and-one-half and $3 million" in E2.0. Tr. 1402:22. He also extended E2.0 a $1 million bridge loan in early 2012, when E2.0 was cash-strapped. Tr. 1504:15–17.

Blattman is one of three E2.0 shareholders who initiated this suit. The other two are: David Staudinger, who invested approximately $55,000 in E2.0, Tr. 398:3–6; and the Lamb Family, which invested approximately $54,000, Tr. 187:25–88:2.

Like Blattman, Siebel was a sophisticated businessperson when he formed C3 in 2009. But unlike Blattman, Siebel had won national recognition for his previous success with a software start-up. In 1993, he founded Siebel Systems, a

3

sales force automation company, with a handful of employees. He grew that company's workforce to more than 8,000 and its annual revenue stream to more than $2 billion. He took Siebel Systems public in 1996 and then sold it to Oracle in 2008 for approximately $5.8 billion.

Siebel formed C3 with a number of former colleagues from Siebel Systems. He named himself CEO of C3 in early 2011, but spent many months thereafter recuperating from an elephant attack he had endured while on safari in Africa. In November 2011, at Siebel's request, Schmaier, who had worked with Siebel at both Siebel Systems and Oracle, agreed to serve as C3's acting Chief Operating Officer during Siebel's convalescence. Tr. 1867:16–8.

## II. The Leadup to the E.20/C3 Merger

E2.0 generated $1.5 million in revenue in 2011. Although that sum was three times the revenue it generated in 2010, it was not enough to keep E2.0 afloat. As Blattman admitted at trial, Scaramellino informed him in December 2011 that E2.0 would run out of cash by the end of February 2012, and thus Blattman deemed the company's capital position to be "problematic" going into 2012. Tr. 1506:14–21, 1507:25–1508:5; DTX-019.10. E2.0 had tried to raise capital from "a dozen or more" venture capitalist firms in the third quarter of 2011 and beginning of 2012. "Two or three" of the firms showed potential interest in investment at a full company valuation of $12 to $15 million. But Blattman "did not see any term

sheet[ ]" and "d[id] not believe that any[ ] [of the firms] at that point had stepped

up." Tr. 1511:1–4. Unable to find third-party investors or obtain a bank loan, in

February 2012 Blattman extended E2.0 a $1 million bridge loan and persuaded a

friend to extend an additional $250,000 bridge loan. Tr. 1513:5–14:9.

That same month, Scaramellino met with Schmaier in California in a bid to

persuade C3 to consider the possibility of combining forces with E2.0. In an email

to Schmaier sent the day after the meeting, Scaramellino reiterated the pitch he had

made to C3 in their initial meeting:

> I think there's a real opportunity for us to pursue here if
> we are able to convince you to approach the SMB and
> residential spaces together. To win this market, an
> approach that recognizes the interconnectedness of all
> three portfolios (Res[idential], SMB, C&I) is critical.
> Combining the expertise embedded in our product and
> team with the tremendous value that your group brings to
> the table would position us as well to disrupt this space
> and make other offerings obsolete. I suspect our
> competitors' investors would begin shaking in their boots
> upon learning of it.

DTX-537.1. Schmaier responded that Scaramellio's "arguments about the

synergies across Res[idential], SMB, and C&I make good sense," and the two men

agreed to explore the possibility of a merger. *Id.*

Both sides saw benefits to combining the companies. For E2.0, a merger

with the more financially secure C3 solved its capital problem. C3 had earned

$15.5 million in revenues in 2011 and had approximately $35 million in cash on

hand. *See* DTX-198.2; *see* PX-9.4; Tr. 1974:19–21. But, for Blattman and Scaramellino, the "biggest motivation for [a] deal" was the opportunity it offered for them to own stock in a Siebel-led company. Tr. 720:15. As Scaramellino credibly testified, Blattman "repeatedly told" him that "being part of the early foundation of . . . Siebel's next company was potentially a once-in-a-lifetime opportunity." Tr. 720:12–19. From Blattman's perspective, "[t]he entire thesis of [a merger] was to get stock early on in . . . Siebel's next multibillion dollar company." Tr. 1335:21–23.

For C3, a merger with E2.0 offered the possibility of a combined entity capable of servicing utility companies' energy-saving software needs in all three customer segments—C&I, SMB, and residential. That capability would make a post-merger C3 more attractive to utilities, as it made possible omnibus service agreements that reduced for the utilities both the number of vendors they had to manage and their overall costs.

On February 29, 2012, Scaramellino and representatives from E2.0 gave Schmaier a detailed product demonstration of E2.0's software. On March 4th, Schmaier had dinner with Blattman and Scaramellino in New York "to get to know each other and to talk about the proposed merger." Tr. 1880:12–14. During the course of the dinner, Schmaier disclosed four valuations of C3 from third-parties: a $256 million implied valuation based on the price Constellation Energy paid for

C3 shares in a 2010 financing round; a $1 billion valuation recited in a purchase term sheet presented to C3 by Goldman Sachs; and two oral offers to buy C3 for $500 million. *See* DTX-562.4–5. At no point, however, did Schmaier offer his own opinion or make a representation about C3's actual valuation.

The following day, Schmaier and two colleagues from C3 visited E2.0's New York office to gain a better understanding of E2.0's products, workforce, and revenue stream. That evening, on the plane ride back to California, Schmaier typed out for Siebel a detailed summary of the information he had gained from his meetings about E2.0's finances, operations, work environment, staff, and customer base. The final two sections of his summary read as follows:

> Final Discussions re Debt
> I had a private discussion with Tom [Scaramellino] and Eric [Blattman] at the end to better understand the debt issues. They were both very comfortable talking about it in front of each other and seem to share everything.
>
> Eric has put $2.5 million into the company, and also loaned the company $2 million ($1 million of which has been paid back). Eric seems to really understand the value we can bring, so he said he wants to "roll most of his investment" into C3 if we do this, but would like to get a little liquidity. He also is the guy who brought in the other investors, so he needs to take their temperature to see what the others want to do.
>
> Tom has $200k in law school loans, and also owes family members $100k to help him get to where he is with the company. He and I talked alone a bit more outside before I left, and it sounds like he wants to pay off these loans and also have enough for a down payment on a

"small condo" as he is getting married in June. Eric commented before I left that Tom works all the time, eats and sleeps at the office, and they used to pay him $50k a year. Finally, they gave him a raise to a more reasonable level. Tom suggested when we were alone that there are a number of creative ways we could deal with this liquidity issue . . . . [H]e suggested that the deal could be a stock for stock deal for all of the employees and other investors, and we could give Tom a signing bonus and pay back Eric's loan.

These short term debt issues are why their last two M&A negotiations were structured with either $2 million or $3 million in cash.

<u>Valuations</u>
In my private conversation with Tom and Eric, we talked a bit about the process and valuations. I was careful to point out that we are still working hard to understand the numbers, but don't yet have a clear idea of the value for Efficiency 2.0 yet.

Eric stressed that they need to get a better understanding of our value. They had a bad experience with [two potential investors] where [the investors] would not provide sufficient financial information. He believes that C3 is the real deal and quite different, and he also knows the value that you and our entire board and management team bring. He also understands that our multiple and revenue is much greater than theirs, and the upside we bring is considerable. Having said that, he expressed a concern that our valuation will be so high already that it will make it difficult to do a deal. *I had mentioned the $1 billion and $500 million numbers at dinner, and also mentioned the $256 million number a year and a half ago. He seems to have locked onto the $4 million in revenue we did last year associated with a $256 million value as incredibly high.* We agreed that we would need to provide them with sufficient information to make a decision, and that the sum is greater than the individual

8

> parts. He seems quite optimistic but a bit concerned
> about the pending valuation discussion.

DTX-562.4–5 (emphasis added).

In the ensuing days, Scaramellino and Schmaier discussed how to structure a stock-for-stock transaction and what the stock exchange ratio would be. Both men gave credible accounts of their discussions consistent with the other's testimony and the contemporaneous written communications they had with each other and with their respective colleagues. They emphasized in their testimony that they focused in their negotiations on the relative—as opposed to absolute—valuations of the two companies. As Scaramellino explained, "valuing a private company" is "a notoriously difficult thing" to do and thus "the key metric that we focused on was the relative valuation" based on the companies' "relative existing revenues, as well as their projections for revenues." Tr. 300:8–12, 302:3–4, 735:3–5.

E2.0 had approximately $0.5 million and $1.5 million in annual revenue respectively in 2010 and 2011. *See* PX-9.4. C3 had approximately $4.5 million and $15.5 million respectively in 2010 and 2011. *See* PX-9.4; Tr. 1974:19–21. These figures led both parties to focus quickly on a C3-to-E2.0 stock exchange ratio of between 9:1 ($4.5M/$0.5M) and 10:1 ($15.5M/$1.5M).

On March 12th, Blattman, Scaramellino, and a number of their colleagues from E2.0 met with Schmaier and members of C3's management team at C3's offices in California. Schmaier provided Blattman and Scaramellino a written

9

sheet of "proposed terms" for "preliminary discussion purposes only." DTX-043. The proposal contemplated C3 buying E2.0's stock for a total potential consideration of $45 million paid in the form of $1 million in cash, $19 million in C3 equity securities issued at closing, and up to $25 million in C3 equity securities issued in three "earn-out" traunches if the acquired E2.0 business met specified financial goals in the three years following the merger. *Id.* The C3 equity securities were "based on a C3 pre-acquisition valuation of $500 million." *Id.* The $500 million valuation was based on an exchange ratio slightly greater than 11:1 (i.e., $500M/$45M) that gave C3 room to negotiate down to a 10:1 ratio. Tr. 1894. Schmaier and Scaramellino both testified that they understood the $500 million figure to be an arbitrary number—a proxy to serve as the common denominator with which to calculate the absolute number of C3 units each E2.0 unitholder would gain from the transaction. *See* Tr. 1891:17–20 (Schmaier) ("Because C3 and Efficiency 2.0 have different numbers of units. In order to get to the number of units that each unitholder would get from Efficiency 2.0, you have to introduce dollars as a common denominator."). As Scaramellino explained at his deposition:

> [T]he absolute values of the valuations, at least as they relate to this particular deal, are somewhat arbitrary.
> You could have valued C3 at $10 and valued E.20 at 50 cents pre-earnout and $1 post earnout and you

would have received the same exact practical outcome in the transaction.[2]

Tr. 732–33. Scaramellino emailed a copy of the preliminary term sheet that evening to Blattman and E2.0's transactional lawyers, Ken Gordon and Bill Schnoor of Goodwin Proctor. Blattman responded after midnight: "what r ur thoughts? 500 m seems way to high." DTX-040.2. Scaramellino replied at 2:21 a.m. on March 13th:

> No need to focus on their valuation. What would you possibly say to Siebel to move it that he wouldn't have a response to – telling a guy like that how much his company is worth is a waste of time. There are other levers that we can make a stronger case for which would have the same effect as lowering their valuation.

DTX-040.

---

[2] Blattman testified that the $500 million valuation was not a relative valuation and was not tied to a stock exchange ratio. He described Scaramellino's and Schmaier's testimony about the relative valuation as "ridiculous." Tr. 1423:7. Blattman's testimony on this point and his insistence that Defendants represented as a matter of fact that C3 had a value of $500 million lacked credibility. I make that finding based on Blattman's demeanor during his testimony and the fact that his testimony is contradicted by the credible testimony of Schmaier and Scarmellino and by the emails and memoranda drafted by Schmaier, Scarmellino, Blattman, and Siebel contemporaneous with the negotiation and consummation of the merger. I also find it makes no sense that a sophisticated party like Blattman would agree to a merger based on a "representation of fact" that a private company like C3 is worth a sum certain. The value of a private start-up cannot be stated with exact precision and is ultimately a matter of opinion. *See Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003) ("Delaware law teaches one lesson very clearly: valuation decisions are impossible to make with anything approaching complete confidence. Valuing an entity is a difficult intellectual exercise[.]"), *reversed in part on other grounds by Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26 (Del. 2005).

Later that morning, Blattman, Scaramellino, and the E2.0 team met with Siebel and Schmaier at C3's offices. Scaramellino argued for increasing E2.0's relative valuation to $50 million, which would result in a 10:1 stock exchange ratio (i.e., $500M/$50M). Tr. 307:17–21 ("we were making the case for more of their stock. So we were making the case for a higher relative share. We frankly could have cared less about the actual [valuation] number."). For his part, Siebel was "very careful" not to give his own opinion about the valuation of C3. Tr. 2884:8. He did, however, discuss the four valuations that Schmaier had disclosed to Blattman and Scaramellino at the March 4th dinner in New York, and he showed Blattman and Scaramellino the March 2011 term sheet from Goldman Sachs that valued C3 at $1 billion.

In the ensuing two weeks, the parties engaged in due diligence and worked with their respective lawyers to hammer out a final term sheet. As part of this process, C3 made available to E2.0: its revenue data and projections; a 409A valuation performed by the Grant Thornton LLC accounting firm, which valued C3's Class C common shares at approximately $0.33 per share as of December 31, 2011;[3] paperwork associated with Constellation Energy's 2010 investment in C3, which implied a valuation of C3 of approximately $256 million; C3's audited

---

[3] A 409A valuation is an appraisal of a company's shares of stock that is conducted to determine for tax purposes the value of stock options. *See* 26 U.S.C.A. § 409A, I.R.C. § 409A.

financial statements as of December 31, 2009 and 2010; C3's preliminary

unaudited financials through December 31, 2011; and its preliminary unaudited

financials through March 31, 2012.

On March 30th, C3 sent E2.0 what became the final term sheet, in which C3

agreed to a 10:1 stock exchange ratio calculated using a total potential purchase

price of $50 million and a valuation of C3 set at $500 million. The potential

purchase price consisted of a $1.25 million payment to satisfy the bridge loans

extended to E2.0, $23.75 million in C3 Units issued at closing of the deal, and up

to $25 million in earnout C3 Units if specified financial goals for the acquired E2.0

business were achieved post-merger. PX-5B. The term sheet defined C3 Units as

Class C Units of C3 "calculated based on a [pre-acquisition] valuation of $500.0

million." *Id.* The term sheet also provided for a holdback by C3 of $4 million in

C3 units as partial security for E2.0's obligations to indemnify C3 for breaches of

certain representations, warranties, and covenants. *Id.*

In an email exchange about the final term sheet that morning, Scaramellino

asked Blattman "are you good for me to sign today?" DTX-066. Blattman asked

in response if Scaramellino was "comfortable with the financials." *Id.*

Scaramellino replied in relevant part: "[T]hey will need to go out for more cash

one year from now" but "[i]f they got 250 over a year ago [from Centennial

Energy] with only 4M in revenue (!) and don't need money for another year, I'd be

surprised if they couldn't pull off a 500 val.  That is just 2x val bump in 2yrs."
DTX 066.1.  Blattman responded: "[O]k sign it."  *Id.*

Once the term sheet was signed, the companies' lawyers began drafting a
formal merger agreement.

## III.  The Merger Agreement

C3 and E2.0 entered into the Agreement and Plan of Merger (the Merger
Agreement), dated as of April 30, 2012.  PX-1.1; DTX-006.1.  The Merger
Agreement effectuated a triangular merger.  C3 set up a subsidiary that merged
with E2.0 and then ceased to exist, resulting in C3 owning E2.0 and E2.0's pre-
merger unitholders owning stock in C3.  Three provisions of the Merger
Agreement are central to Plaintiffs' claims.

### A. The Unit Exchange Ratio and Unit Divisor

First, section 1.2(a), titled "Estimated Upfront Exchange" provides in
relevant part that at the effective date of the merger "each Unit [i.e., each share of
E2.0] shall be converted into the right to receive . . . *a number* of Parental Units
[i.e., shares of C3] . . . equal to . . . the 'Unit Exchange Ratio' . . . plus" any other
C3 shares "that may be issued with respect to such Unit pursuant" to the holdback,
earnout, and other accounting-related provisions in the Merger Agreement.  PX-1 §
1.2(a) (emphasis added).  The Merger Agreement defines the Unit Exchange Ratio
as "*the quotient of*: (A) *the quotient of*: (1) the Estimated Up-Front Exchange

14

Amount minus the Holdback Amount, divided by (2) the Fully Diluted Units;

divided by (B) the Unit Divisor." *Id.* (emphasis added).

It is important to note that *both* the numerator (A) and the denominator (B)

of the Unit Exchange Ratio are dollar amounts, and thus the ratio itself is *not* a

dollar amount. In other words—and contrary to Plaintiffs' arguments—the

language of the Merger Agreement itself makes clear that the Unit Exchange Ratio

is used to calculate the *number*, not the *value*, of shares E2.0 Unitholders received

as a result of the merger.

Turning first to the Unit Exchange Ratio's numerator (A): This number is

itself a ratio of (i) the Estimated Up-front Exchange Amount divided by (ii) the

Fully Divided Units. The Estimated Up-front Exchange Amount corresponds to

the non-holdback portion of the $25 million figure (i.e., $21 million) used in the

March 30th term sheet to calculate the number of C3 Units to be issued to E2.0's

shareholders at closing based on an assumed $500 million valuation of C3. The

Merger Agreement defines this term as:

> (a) $21,337,013.30; *plus* (b) the amount, if any, by which
> the Estimated Working Capital exceeds the Working
> Capital Target; *minus* (c) the amount, if any, by which
> the Working Capital Target exceeds the Estimated
> Working Capital; *plus* (d) the amount, if any, by which
> the Estimated Cash exceeds the Cash Target[;] *minus* (e)
> the amount, if any, by which the Cash Target exceeds the
> Estimated Cash[;] *minus* (f) the amount, if any, by which
> the Estimated Indebtedness exceeds the Debt Target.

*Id.* at 1.00049 (emphasis in original). The Merger Agreement defines Fully

Diluted Units as the number of E2.0 shares issued and outstanding at the time

immediately before the merger plus the number of E2.0 shares that were subject to

outstanding options and warrants at that time. *Id.* at 1.00049. Thus, the Unit

Exchange Ratio's numerator (A) is a per-E2.0-unit dollar amount.

The denominator (B) of the Unit Exchange Ratio is the Unit Divisor, which

the Merger Agreement defines as "an amount equal to $3.33." *Id.* at 1.00053.

That dollar figure was obtained by dividing the assumed $500 million value of C3

by the number of outstanding shares of C3 (i.e., 150,150,150 shares) at the time of

the merger. Tr. 2055:24–57:12; *see also* Tr. at 1812:3–12 (E2.0's expert,

Metcalfe) (saying that 150,009,000 C3 shares were outstanding at time of merger

and that "[w]hen you divide the 500 million by the 150,009,000, that is how the

$3.33 [Unit Divisor] comes into play"). The $3.33 Unit Divisor, in other words, is

a per-C3-unit dollar amount based on an assumed valuation of $500 million. And

thus, the Unit Exchange Ratio is the ratio of the calculated per-E2.0-unit dollar

amount divided by the calculated per-C3-unit dollar amount—calculations based

on assumed relative valuations of E2.0 (at $50 million) and C3 (at $500 million).

## B. The Holdback Provisions

Section 1.2(e) of the Agreement required C3 to issue to each E2.0

Unitholder within 18 months of the merger's closing date that unitholder's pro rata

percentage of the Holdback Units unless C3 had "given a Notice of Indemnification Claim containing an indemnification claim which has not been resolved." DTX-006.2 §1.2(e). Consistent with the March 30th term sheet, which contemplated a holdback of shares equivalent to the amount of $4 million based on an assumed $500 million valuation of C3, the Merger Agreement defined Holdback Units to "mean 1,201,201 Parent Units" (i.e., C3 shares). *Id.* at 1.00049. (1,201,201 shares multiplied by $3.33—the Unit Divisor—equals $4,000,000.)

Under § 6.5(a) of the Agreement, any Notice of Indemnification Claim was required to contain: (1) "a description of the circumstances supporting" C3's belief that "there is or has been an inaccuracy in or breach of a representation, warranty, covenant or obligation contained in this Agreement" and (2) "a good faith, non-binding, preliminary estimate of the aggregate dollar amount of Damages that have arisen or reasonably may arise as a result of the inaccuracy, breach or other matter referred to in such notice." DTX-006.35 §6.5(a).

### C. The Earnout Provisions

Section 1.4(a) of the Merger Agreement sets forth the terms under which E2.0 Unitholders could potentially be awarded Earnout Units (i.e., C3 shares) based on the post-merger performance of the Company Business Unit (i.e., the business unit within C3 responsible for the development, marketing, and sales of legacy E2.0 products). PX-1.3–6 §1.4. Section 1.4(a)(ii) calls for an Earnout

Event for each of the three years following the merger. Each Earnout Event is

defined as the issuance by C3 of a set number of Earnout Units if dollar-specific

revenue targets (the Company Business Unit Revenue) and profit targets (the

Company Business Unit Profit) were achieved by the Company Business Unit.

PX-1.4 § 1.4(a)(ii).

Section 1.4(a)(vii) provides that C3

> shall not take any action in bad faith whose purpose is to
> intentionally minimize or intentionally interfere with the
> achievement of any Earnout Event. Notwithstanding the
> foregoing, for the avoidance of doubt, [C3] shall have
> sole discretion over all matters relating to the [E2.0]
> Products and shall be under no obligation to operate (or
> cause to be operated) [C3] or the Company Business Unit
> to achieve any specific level of Company Business Unit
> Revenue or Company Business Profit.

PTX1.00005 § 1.4(a)(vii).

## IV.  Alleged Misrepresentations about C3's Value And Business Condition

Plaintiffs' fraud claims are based on two categories of alleged

misrepresentations. First, Plaintiffs allege that Defendants falsely represented "that

C3 was worth $500 million." D.I. 374 at 30.[4] Second, they allege that Defendants

---

[4] For reasons not clear to me, Defendants did not argue that the precise dollar value
of a private start-up company like C3 is a matter of opinion that cannot serve as the
basis for a fraud or securities claim.

mispresented the business condition of C3. *Id.* at 33. The record evidence proves otherwise.

## A. C3's Value

Plaintiffs allege that Siebel and Schmaier made false oral representations that C3 was worth $500 million and that Defendants falsely represented in the Proposed Terms and Letter of Intent and the Merger Agreement that C3 was worth $500 million. D.I. 374 at 30.

### 1. Oral Representations Regarding C3's Value

Siebel and Schmaier both credibly testified that they never orally represented to Plaintiffs what the value of C3 was. Tr. 1891:21–24, 1892:16–24, 2384:5–14. Siebel testified that he "didn't want to miss any expectations, and so I never made – gave any opinion as to what the value was, and as a matter of fact, I explicitly stated that I had no idea what the value was." Tr. 2384:12–14.

Instead of representing to Plaintiffs what C3 was objectively worth (as if that were possible) or what they thought C3 was worth, Siebel and Schmaier shared with Plaintiffs multiple—and differing—valuations of C3 that they had received from third parties so that Plaintiffs could draw their own conclusions about C3's potential value. Tr. 1558:11–1560:25 (Blattman); Tr. 205:3–15 (Lamb); Tr. 575:13–577:14 (Arky); PX 9.4 (Arky Notes); Tr. 734:24–735:5 (Scaramellino); Tr. 1892:10–1893:13 (Schmaier); Tr. 2384:15–2385:10 (Siebel). Specifically, they:

(1) provided Plaintiffs the 409A valuation by Grant Thornton, *see* DTX-062.1, 6;

Tr. 1565:6–13 (Blattman); (2) informed Plaintiffs of the implied $256 million

valuation based on Constellation Energy's 2010 investment in C3, *see* Tr. 576:3–7

(Arky); PX 9.4 (Arky Notes); Tr. 1558:12–22 (Blattman); (3) informed Plaintiffs

that C3 had received two offers from third parties proposing to invest in C3 at a

$500 million valuation, *see* Tr. 576:17–577:2 (Arky); PX 9.4 (Arky Notes); Tr.

1558:25–1559:3 (Blattman); and (4) informed Plaintiffs about Goldman Sachs's $1

billion valuation, *see* Tr. 576:12–16 (Arky); PX 9.4 (Arky Notes); Tr. 1433:14–

1434:8 (Blattman); DTX-096.2 (Goldman Term Sheet).

I credit Schmaier's testimony that Defendants "were trying to be

transparent" and to give the E2.0 Unitholders "all information they needed to make

a decision." Tr. 1893:14–18. Scaramellino understood that Defendants were

"providing [this] data to triangulate around a notoriously difficult thing, which is

valuing a private company." Tr. 734:24–735:5. No witness alleged or even

suggested that the valuations had not actually been provided by the third parties in

question or that the valuations were based on false data. Moreover, Defendants

also provided Plaintiffs actual financial data for Plaintiffs to test the valuations and

make up their own mind about what C3 was worth. Specifically, they gave

Plaintiffs: (1) audited C3 financial statements as of December 31, 2009 and 2010

(DTX-074.2–20); (2) preliminary unaudited C3 financials through December 31,

2011 (DTX-074.21–22); and (3) preliminary unaudited C3 financials through March 31, 2012 (DTX-570.2–3). There was no allegation or suggestion that any of this information was false.

Other than Blattman and former E2.0 employee Andrew Frank, no witness claims to have heard Siebel or Schmaier orally represent that C3 was worth $500 million. *See* Tr. 205:3–11 (Lamb); Tr. 405:19–406:12 (Staudinger); Tr. 577:10–14 (Arky); Tr. 727:12–17 (Scaramellino); Tr. 535:5–11 (Shohet); Tr. 1384:6–10 (Streetman). Frank claims Siebel orally stated that C3 was worth "at least $500 million" during a meeting in California on March 12 or 13, 2012. Tr. 107:22–108:3 (Frank). Although he testified at trial that this alleged representation was memorable, Tr. 171:20–22, his trial testimony differed from his earlier deposition testimony. When asked at his deposition to identify every pre-merger misrepresentation he believed Defendants had made, Frank never mentioned a $500 million oral representation. Tr. 171:23–173:24. Indeed, at no point in his deposition did Frank make mention of a $500 million oral representation. Tr. 173:25–174:4. Because of this inconsistency, the complete absence of any documentary evidence to support his claim that Siebel orally represented a $500 million absolute valuation of C3, and the credible testimony of Siebel and Schmaier, I give no credit to Frank's trial testimony.

I similarly will disregard Blattman's testimony. As an initial matter, Blattman could not identify any pre-merger document in which he (or anyone else) wrote that Defendants had represented that C3 was worth $500 million. Tr. 1561:18–1562:19 (Blattman). Blattman's own handwritten notes from March 2012 connect "500 m" to C3's "valuation rds" using arrows, PX-90-1.1, and Blattman confirmed that this "500 m" notation referred to the two $500 million financing term sheets (or valuation rounds) C3 had disclosed to him. Tr. 1541:21–1542:1.

Blattman's emails at the time of the merger also undermine his trial testimony. On March 30, 2012—approximately two weeks after the alleged oral representation about C3's valuation—Scaramellino emailed Blattman that he would "be surprised if [C3] couldn't pull off a 500 val[ ]" in another year. DTX-066.1. Scaramellino was referring to C3 potentially reaching a $500 million valuation "a year from March of 2012,"—i.e., "at that future point in time." Tr. 1334:19–1335:4. Blattman understood that Scaramellino was saying that C3 *might* reach that valuation *in the future*. Tr. 1431:1–5; *see also* Tr. 1335:5–1336:4 (Scaramellino testifying that he could not recall whether Blattman ever disagreed with Scaramellino's email about C3 being valued at $500 million in another year, and that Blattman never asked Scaramellino about a putative $500 million absolute valuation of C3).

I also find it telling that the initial draft complaint that Blattman reviewed and provided comment on for his attorneys did not allege or even suggest that anyone at C3 represented that C3's absolute valuation was $500 million. DTX-378. Blattman testified that this draft was the product of six months of work with his attorneys. Tr. 1577:17–1578:1. Although the draft discussed the March 12 and 13, 2012 meetings during which Blattman now claims Defendants represented that C3 was worth $500 million, the draft did not state or imply in any way that Siebel—or anyone else at C3—represented at those meetings that C3's absolute valuation was $500 million. DTX-378.9–10 ¶¶ 20–22, 24. Rather, the draft complaint alleged that "*[P]laintiffs had arrived at the determination* that C3 was valued at *over $250 million* and that its valuation would continue to accumulate after the Merger[.]" DTX-378.15-16 ¶51 (emphasis added). This statement is consistent with Scaramellino's March 2012 email to Blattman in which Scaramellino referenced both C3's prior "[$]250" million valuation and the notion that its valuation could continue to rise such that C3 could "pull off a 500 val" a year from March 2012. DTX-066.1. It is also consistent generally with the testimony of Siebel, Schmaier, and Scarmellino, and it undermines Blattman's trial testimony.

## 2. Written Representations regarding C3's Value

Although Plaintiffs contend that Defendants represented in the Merger Agreement that C3 was valued at $500 million, Blattman acknowledged at trial that no provision in the Merger Agreement states that C3 was worth that sum. Tr. 1614:22–1615:3. Plaintiffs, however, claim that the Unit Divisor in the Merger Agreement "represented the per-share value for C3" at the time of the merger and that the inference to be drawn from that representation is that C3 was worth $500 million. D.I. 374 at 9.

As discussed above, it is clear from the Merger Agreement itself and the term sheets that led to it that the Unit Divisor was not a representation of actual value, but rather was a posited dollar amount that was derived from an assumed, relative $500 million valuation of C3 and was used as part of the Unit Exchange Ratio to calculate the number of C3 shares the E2.0 shareholders were owed upon consummation of the merger.

Defendants adduced credible testimony at trial from Eric Jensen that confirms this reading of the Merger Agreement and term sheets. Jensen was C3's principal lawyer for the drafting and negotiation of the Merger Agreement. As he explained at trial, the term Unit Divisor says "nothing" about the value of C3's shares and represents only "the number that you used to calculate[ ] the exchange ratio." Tr. 2056:19–2057:12. Jensen's testimony is supported by the statements

made by E2.0's own counsel, Goodwin Proctor, during the negotiation of the Merger Agreement. It was Goodwin Proctor that insisted on the name Unit *Divisor*. The term had initially been called Unit Value, but for tax reasons Goodwin Proctor changed the name of the term precisely to remove any suggestion that $3.33 was "the value of the shares [E2.0 Unitholders] were receiving in C3." Tr. 2057:13–2058:4; *see also* DTX-114.55, Ex. A (reflecting Goodwin's proposed change of term "Unit Value" to "Unit Divisor"); Tr. 2060:2–17. For the same reason, Goodwin removed references to a Purchase Price in an earlier draft of § 1.2(a) of the Agreement and substituted in its place the term Exchange. DTX-114.2–3 §1.2(a); Tr. 1589:14–1590:20 (Blattman); Tr. 2058:5–2059:6 (Jensen). (Blattman also acknowledged at trial that E2.0 was aware of statements by Goodwin Proctor that the "$3.33 is totally not close to what [the C3 shares] are actually worth[,]" but instead amounted to an "inflated price . . . put on the value of the C3 equity for purposes of doing this deal[.]" *See* DTX-707.4–5, Request for Admissions 14, 19, 23. I find it informative (but not surprising) that Plaintiffs did not call a Goodwin Proctor witness at trial to contradict Jensen's testimony.)

Jensen also credibly explained that the $500 million figure in the parties' term sheets was "not a representation of value and the word 'calculated' [in the term sheets] is intended to show you're using [the $500 million figure] to do the calculation that gives you the exchange ratio." Tr. 2054:13–2055:2. As

Scaramellino testified, "[y]ou could have valued C3 at $10 and valued E2.0 at 50 cents pre-earnout and $1 post[-]earnout and you would have received the same exact practical outcome in the transaction." Tr. 733:4–7. Jensen explained why the parties used dollar figures ($500 million for C3 and $50 million for E2.0) rather than simply referring to the ten-to-one ratio: In his words, dollar values provided a "much easier mechanism[ ]" to calculate "how many [C3] units w[ould be] given up front, how many units [could be] in the earnout, [and] what were the holdback shares." Tr. 2054:17–2055:23. No document in evidence authored by Plaintiffs prior to the merger suggests in any way that Plaintiffs believed that the use of $500 million in the term sheets or Merger Agreement constituted a representation by Defendants that C3 was actually worth $500 million. In fact, the contemporaneous communications confirm that $500 million was never considered to be a representation of actual value.[5]

For example, Goodwin advised E2.0 and Blattman to "[c]onsider asking [C3] for an independent valuation of the combined company[,]" DTX-042.1, notwithstanding the $500 million reference in the merger's term sheet. PX-4.1; Tr.

---

[5] Plaintiffs asserted that C3's decision to cash out at a $3.33 per-share rate fractional shares of certain unaccredited investors who were not permitted to participate in the merger proves that $3.33 was a representation of value. It does not. As Jensen explained, C3 needed to use some amount for these cash-outs and using $3.33 resulted in a total payment of $52.13. Tr. 2061:21–2062:8. In other words, it was not worth engaging in an actual valuation of C3 since the $3.33 figure resulted in an immaterial payment.

1549:25–1551:24 (Blattman). But neither Plaintiffs nor E2.0 obtained an independent valuation. Blattman explained why: "I don't need an independent valuation as a professional investor. Those are decisions that I made." Tr. 1554:17–1555:3; *see also* Tr. 1432:16–17 ("I'm an investment professional. That's my job to determine the valuation.").

Contemporaneous communications between Blattman and Scaramellino also confirm that they did not view the term sheet's reference to $500 million as a representation of C3's value. After receiving proposed terms from C3, Scaramellino told Blattman that there was "no need to focus on [C3's] valuation." DTX-040.3. Scaramellino explained that because the merger consideration was based on an exchange ratio, "there are other levers that [E2.0] can [use to] make a stronger case . . . which would have the same effect as lowering [C3's relative] valuation." DTX-040.3. Putting aside the term sheets and Merger Agreement, E2.0 did not present at trial any email, letter, or other document in which Siebel, Schmaier, or anyone else from C3 represented that C3 was worth $500 million.

### 3. C3's Business Conditions

Plaintiffs also allege that Siebel and Schmaier "supported the misrepresented valuation of C3 with multiple misrepresentations concerning C3's business condition." D.I. 374 at 33. Plaintiffs identify in their post-trial briefing six alleged misrepresentations. *Id.* at 6, 33. I address these alleged misrepresentations in turn.

27

### a. C3's Core Business

Plaintiffs first allege that Siebel falsely represented "that C3's 'core' business was with large-company customers (the 'C&I' segment)." *Id.* at 6. Scaramellino testified that Siebel had told him that the C&I segment "had been the core focus of C3." Tr. 278:24. As proof that this representation was false, Plaintiffs cite (1) an excerpt from Scaramellino's deposition and (2) a written response given by Bill Daniher, C3's Vice President of Finance and Operations, on August 1, 2012, to a question posed by the accounting firm Grant Thornton. D.I. 374 at 6 (citing PTX-104). But neither Scaramellino's deposition testimony nor Daniher's written response prove that Siebel made any false representation about C3's C&I business.

In the cited excerpt from Scaramellino's deposition, Scaramellino was asked to confirm that Plaintiff's Trial Exhibit 133 (PTX-133) contained a statement that C3's "sales team indicated to me several times [that] they were aware during the merger that . . . the enterprise [C&I] market had collapsed for some time before the merger." Tr. 298:24–6. Scaramellino confirmed that the exhibit does in fact contain that statement. Tr. 299:6. He was then asked: "Is that statement accurate?" Tr. 299:7. But Scaramellino did not confirm that the statement was accurate. Rather, he testified that "it quickly became apparent"—i.e., *after* the merger—that C3's sales staff was "incredibly unhappy." Tr. 299:8–10. Thus,

28

Scaramellino's testimony does not establish that the C&I market had collapsed before the merger.

PTX-133 itself also does not establish that the C&I market had collapsed before the merger. PTX-133 is undated and there was no testimony at trial that established who created it or when it was created. Plaintiffs attempted at Scaramellino's deposition to have Scaramellino confirm that he had authored the document. Tr. 266:7–67:18. But when confronted with the document, Scaramellino testified that he had no recollection of it, Tr. 266:10–15, and did not "know if I prepared this document specifically or if somebody else prepared it," Tr. 267:17–18. I nonetheless admitted PTX-133 into evidence at trial because Scaramellino testified that the document "looks like something I would have prepared," Tr. 266:19–21, and because this was a bench, as opposed to jury, trial (and thus I was not worried about misleading the fact finder). I also made it clear, however, that because Plaintiffs had failed to establish that PTX-133 met the criteria for any hearsay exception, PTX-133 was admissible solely to impeach Scaramellino and not as substantive evidence. Tr. 253:17–59:14. Thus, the statement in PTX-133 that C3's "sales team indicated to me several times [that] they were aware during the merger that . . . the enterprise [C&I] market had collapsed for some time before the merger" carries no substantive weight and

29

cannot provide a basis to establish the falsity of Siebel's representations about C3's C&I business.

Daniher's written response to Grant Thornton (PTX-104) also does not establish any falsity of Siebel's representations about C3's C&I business before the merger. The written response was drafted in late July 2012—more than two months after the merger. No evidence was adduced at trial to suggest that any of the statements in Daniher's written response about the C&I market were known to Siebel (or anyone else at C3) before the merger.

### b. C3's Customers' Satisfaction and Payments

Plaintiffs next allege that Siebel falsely represented that "C3's C&I customers were satisfied with its product and were paying in full, with no payment disputes." D.I. 372 at 6. Plaintiffs cite PTX-133 and excerpts from Blattman's trial testimony as evidence that Siebel made such representations. As just noted, PTX-133 was not admitted as substantive evidence, so it cannot establish the fact or falsity of any alleged representation made by Siebel. The cited portions of Blattman's testimony concern Slide 25 of a presentation (PTX-7B) that C3 gave at the March 12, 2012 meeting with Blattman and other E2.0 representatives. Slide 25 is titled "Select C3 Customers" and it pictures the trademarks of nine large companies, including Dow and Cisco. Plaintiffs rely on the following testimony from Blattman:

Q. And [Slide] 25 says select C3 customers. Do you see that?
A. I do.
Q. When you saw that at the presentation, what stood out to you?
A. Again, it's really incredibly impressive. These are many Fortune 500 or 100 some, maybe even Fortune 50 companies, and then within their specific space, in other words, within commercial, you have Cisco Systems, leading technology company in the world. You have Dow Chemical in industrial. You have GE. All -- if you had to start out a business and partner companies within those silos or segments, those are some of the companies that you would hope to get.

\* \* \* \*

Q. And what did Mr. Siebel say about those customers that he had highlighted in the slide?
A. They were very happy with their product. They were paying on time and they were, it was all good.

Tr. 1416:17–1417:4, 1418:14–17.

Even assuming Blattman was a credible witness—and I did not find him to be so—this testimony does not establish that C3 did not have any payment disputes with any of its customers before the merger. At most it establishes that Siebel represented before the merger that the nine C3 customers identified in Slide 25 were happy with C3's products and were paying on time.

Assuming that that these representations were made, Plaintiffs did not prove by a preponderance of the evidence that they were false. The only record evidence Plaintiffs cite to establish their falsity is PTX-47, an email sent by Daniher in November 2012 to KPMG that has a one-page attachment titled "C3 Material Events January 1, 2012 to June 30, 2012." The only portion of PTX-47 possibly

relevant to the alleged misrepresentation is a bullet point that reads: "Mar. 2012: Dow restructured their agreement from $4.5 million for Year 3 (due March 30, 2012) to 1.5M per year over a 3[-]year period. Contract amended from 3 to 5 years." PTX-47.00003.

This bullet point does not prove by a preponderance of the evidence that a pre-merger representation that Dow was happy with C3's product and was paying in full was false. A restructuring of a contract is not necessarily a bad thing for a supplier. In this case, the contract was extended and the $4.5 million for the third year of the original contract was not lost but instead was made payable over three years. Moreover, the contemporaneous notes of a C3 board meeting held on March 18, 2012—i.e., around the time of the merger—make clear that the restructuring was viewed by C3 as advantageous and that any representation made in March 2012 that Dow was a happy and paying customer was justified. *See* DTX–198.3 ("Dow Chemical: Has made decision to move forward with their C3 deployment. Contract terms have been renegotiated to both companies' satisfaction. $1.5 million payment expected in March/April. Dow is enthusiastic about the Version 3 product.").

### c. C3's Revenue Stream and Customer Contracts

Plaintiffs next allege that Siebel falsely represented "that C3's revenues from [its C&I] customers were 'secure,' 'non-cancellable,' and 'guaranteed' in a

minimum amount of $21 million for fiscal year 2013." D.I. 374 at 6. Scaramellino testified that Siebel represented that C3 had "non-cancellable, non-refundable contracts" that provided "slightly north of $20 million of secure revenue" for the 2013 fiscal year. Tr. 281–82. Plaintiffs again cite PTX-47, the "material events" attachment to Daniher's November 2012 email to KPMG, as evidence that this representation was false. Nothing in PTX-47, however, establishes by a preponderance of the evidence that Siebel's representation was false at the time it was made.

As an initial matter, the material events attachment was drafted six months after the merger. Thus, the bullet point from the attachment on which Plaintiffs rely—"Dec 2011 [C&I] product release[ ] [d]id not achieve traction by March 31, 2012"—is a retrospective assessment. Second, Daniher, the alleged author of the attachment, was not employed by C3 at the time of the merger. Tr. 597:24–98:3. Third, and most important, it is undisputed that C3 gave E2.0 before the merger all of its then-existing C&I contracts. Tr. 304:22–305:8, 1926:22–24, 2384:2–4. Scaramellino and Blattman both had an opportunity to review all the terms of those contracts. Tr. 304:22–305:13. Scaramellino specifically checked the contracts to "ensure that when [C3] said that there was, you know, a certain amount of revenue from a particular customer, that the contract said the same number." Tr. 304:22–305:13 (Scaramellino). There is no allegation or suggestion that any customer

33

contracts were false or misleading. The contracts were in fact "non-cancellable" and "nonrefundable." Tr. 1925:24–26:7 (Schmaier) (stating that "[n]on-cancellable, nonrefundable is a software revenue recognition concept, and so [C3's] standards for revenue recognition required that the contracts are non-cancellable and nonrefundable").

### d. C3's Percentage of C&I Revenues

Plaintiffs next allege that Siebel falsely represented "that, if the merger of C3 and E2.0 were consummated, 80% of the combined company's revenues would come from C3's C&I market." D.I. 374 at 6. Assuming for argument's sake that a prediction about the composition of future revenue streams could constitute a representation of fact upon which a fraud or securities claim could be based, Plaintiffs cited in their post-trial briefing no record evidence from which it could be ascertained what percentage of C3's post-merger revenues came from the C&I market. Accordingly, Plaintiffs failed to establish the falsity of this alleged misrepresentation.

### e. C3's Head Count

Finally, Plaintiffs allege that Siebel falsely represented "that, as a result of the success that C3 was experiencing, C3's headcount was steadily increasing as part of the company's growth strategy." *Id.* As evidence that Siebel made this

alleged representation, Plaintiffs point solely to the following testimony of

Blattman:

> Q.     Other than layoffs in China, what did Mr. Siebel
> say about the head count at C3?
> A.     They were growing. It was growing.

*Id.* (citing Tr. 1419:6–8). Even putting aside Blattman's lack of credibility, the

cited testimony does not stand for the proposition that Siebel represented that "as a

result of the success that C3 was experiencing, C3's head count was steadily

increasing as part of the company's growth strategy." *Id.* at 6. At most, the

testimony supports an assertion that Siebel represented that C3's non-China head

count was growing.

As evidence that the alleged representation was false Plaintiffs point solely

(and once again) to PTX-47, the material events attachment to Daniher's

November 2012 email. *Id.* at 7. Even ignoring the fact that the attachment was

drafted six months after the merger by a person not employed with C3 at the time

of the merger, the document does not prove by a preponderance of the evidence

that a representation made sometime in March 2012 that C3's non-China head

count was growing was a false representation. According to the document, C3's

"Total Non China" head count was 87 employees as of "Dec-11" (presumably

December 31, 2011), 66 employees as of "Mar-12" (presumably March 31, 2012),

and 89 employees as of "Jun-12" (presumably June 30, 2012). PTX 47.0003. The

document does not indicate when or how the drop from 87 to 66 employees occurred by the end of the first quarter of 2012. It could be that C3 lost 22 or more employees in early January 2012 and then hired 1 or more employees in the first week of March 2012. If so, that would be perfectly consistent with a representation on or before March 12, 2012 that C3's workforce was "growing." The bottom line is that the document does not prove that a representation that C3's workforce was growing as of early March 2012 was false.

## V. Alleged Actions Taken in Bad Faith to Minimize or Interfere with The Achievement of Earnout Events

Plaintiffs argue that C3 breached the earnout provisions of the Merger Agreement "based on C3's firing of E2.0 employees and closing of the E2.0 Business [U]nit" that "destroy[ed]" the Business Unit's "ability to grow its revenues." D.I. 374 at 65–66. Plaintiffs are correct that this "claim turns on the question of bad faith." *Id.* at 66.

I find that C3 did not act in bad faith. On the contrary, as Schmaier wrote on April 18, 2012 (two weeks before the merger's closing) in an internal "M[emo] regarding the Efficiency E2.0 Acquisition Rationale," C3 genuinely believed that that if E2.0 realized the "revenue and profitability targets [in the Merger Agreement], then [C3] w[ould] also acquire significant new revenues and customers, making the deal well worth 10% of our company." DTX-229.1. In other words, C3 wanted the E2.0 Business Unit to succeed because it believed that

the unit's success was good for C3. As Schmaier testified at trial: "We wholeheartedly wanted Efficiency 2.0 to meet the revenue and profitability targets, and it would have been not only good for Efficiency 2.0, but it would have been great for C3, too. So we were fully supportive." Tr. 1952:14–19.

Siebel similarly testified that he wanted the E2.0 Business Unit to be successful "because that welled up into our revenue." Tr. 2390:9–13. Siebel's actions were consistent with his testimony. In early June 2012, for example, when Southern California Edison (SCE) disqualified E2.0's response to a request for proposal for SCE's Residential Behavior Program, Siebel personally contributed to the drafting of C3's written response to the disqualification, with the hope that the E2.0 Business Unit could "regain consideration" for the SCE contract. Tr. 2398:5–11; DTX-877.

Plaintiffs argue that "C3's immediate dismantling of the E2.0 Business [U]nit was in no way consistent with good faith." D.I. 374 at 68. But the record evidence showed that C3's efforts were not directed at the immediate dismantling of the E2.0 Business Unit but instead were focused on expanding customer engagements with E2.0's legacy customers to generate additional revenue, Tr. 161:18–62:1, and trying to improve the E2.0 Business Unit's proposals to prospective customers, see, e.g., Tr. 168:8–19, 2398:5–11; DTX-843; DTX-837; DTX-877. There was also credible testimony that C3 employees spent months

"sleeping under [their] desks" in order to complete and deliver an SMB product that E2.0 had committed to providing SCE. Tr. 2225:21–26:3.

In sum, Plaintiff's failed to establish that C3 intentionally minimized or interfered with the E2.0's Business Unit, let alone acted in bad faith, to prevent the achievement of the revenue and profit targets required for Plaintiffs to obtain the Earnout Units.

## VI.  Events Related to C3's Retention of The Holdback Units

On October 4, 2013, C3 delivered to Plaintiffs a Notice of Indemnification Claim "in accordance with Section 6.5(a)" of the Merger Agreement. PTX-64.00001. C3 stated in the Notice that it "believe[d] that there [were] inaccuracies in or ha[d] been breaches of several of the representations and warranties made by E2.0 in the Merger Agreement." *Id.* It then identified alleged breaches and inaccuracies related to E2.0's sales pipeline, software, and source code. *See id.* C3 "advised" E2.0 in the Notice that it "will withhold the Holdback Units until this Claim has been resolved, consistent with Section 1.2(e) of the Merger Agreement." PTX-64.00003. C3 also stated that its "preliminary estimate of the aggregate dollar amount of Damages that have arisen as a result of the breaches and inaccuracies is approximately $4.45 million (the 'Claimed Amount')." *Id.*

I find that the preponderance of the record evidence established that C3's Claimed Amount of $4.45 million was not made in good faith. Because of this

finding, I need not and do not make definitive factual findings with respect to C3's assertions that it uncovered inaccuracies and warranty breaches related to E2.0's sales pipeline, software, and source code.

In discovery, Plaintiffs requested "all Documents relating to the $4.45 million 'Claimed Amount'" in C3's indemnification notice. D.I. 360, Ex. 13A at 1. In response, C3 produced a single document—a one-page Excel spreadsheet listing three "Investments" of work hours. C3 marked the document as DTX-442. The spreadsheet purports to identify the work hours spent by C3 employees to replace E2.0's software. DTX-442 is bare-boned to say the least. It identifies three categories ("Residential 1.0 Defect Fixing," "Residential 2.0 Development to Meet Committed Requirements" and "E2.0 Product Management and Support") and a single number of corresponding work hours for each of those categories. For two of the categories, there is no employee breakdown, but simply a stated number of total hours. For one of the categories, total hours are stated for seven employees and also for "Efficiency 2.0 Team." A cost for the total hours for each of the categories is identified; and the bottom (i.e., 15th) row of the spreadsheet identifies the total cost as $4,349,040.

Plaintiffs filed a motion in limine before trial to exclude DTX-442 from evidence. They argued among other things that C3 had not produced any backup documents to support the hours or associated costs claimed in the spreadsheet, that

39

no witness had authenticated the document, that the spreadsheet was produced as a stand-alone document without any metadata to explain its origin, and that C3 could not lay a foundation to justify the document's admission as evidence. *Id.* at 3.

In its response to the motion, C3 stated that Plaintiffs' representation that the spreadsheet was the only document produced in response to Plaintiffs' request for "all Documents relating to the $4.45 million 'Claimed Amount'" was "not accurate." D.I. 360, Ex. 13B at 1. But C3 did not identify in its response any other produced document relating to the Claimed Amount, and C3 never subsequently identified such a document. With respect to Plaintiffs' complaint that C3 had failed to produce the metadata for the spreadsheet, C3 stated only that it was not required to produce such data before trial. Finally, C3 stated that Siebel "is familiar with C3's recordkeeping practices and is capable of providing the foundation for [the spreadsheet] at trial." *Id.* at 2.

Although Defendants called Siebel as a witness at trial, they did not ask him a single question about DTX-442. Instead, they asked him if he had authorized the delivery to E2.0 of the Notice of Indemnification Claim and if he "knew where the [$4.45 million Claim Amount] number came from?" Tr. 2408:19. Siebel answered:

> I believe it was Anya Darrow, who was the person who kept track of, at the time, of engineering and product marketing resources, and she looked at, you know, basically – and we kept very precise records as to who

> spent time doing what down to really the minute, and this
> was as of that date, okay, how much we had spent, okay,
> repairing the bugs and building a product to meet the
> product – the market needs.

Tr. 2408:20–09:2. One problem with this testimony is that in his deposition Siebel

identified Houman Bezhadi as the person responsible for calculating the Claimed

Amount. Siebel made no mention of Anya Darrow at his deposition. A second

problem is that C3 did not have "very precise records as to who spent time doing

what down to really the minute . . . as of that date." When I pressed C3's counsel

on this point during closing arguments, he conceded that there was in fact no

"[s]pecific document at the time of the indemnification notice" that supported the

$4.45 Claimed Amount. Tr. 2674:20–25.

Even though C3 did not show Siebel DTX-442 and never asked any other

witnesses questions to establish who made the document, when it was made, and

what data was used to calculate the hours and costs listed in it, C3 sought to admit

DTX-442 into evidence at the conclusion of Siebel's testimony. Tr. 2184:25. I

denied the request based on a lack of foundation. Plaintiffs later requested the

admission of DTX-442 to show bad faith on C3's part; and I admitted the

document into evidence at that point.

DTX-442 and the dubious representations C3 made to the Court about it are

probative of a lack of good faith on C3's part when it asserted in its

indemnification notice that the Claimed Amount totaled $4.45 million. My finding

41

that C3's Claimed Amount was not made in good faith is also based on: (1) C3's admission at the close of trial that there was no specific document contemporaneous with the indemnification notice that supported the $4.45 million Claimed Amount; (2) the fact that there is a $60,000 difference between $4.45 million Claim Amount and the $4.39 million figure in DTX-442 and no witness explained the reasons for that difference; and (3) the suspect nature of at least some of C3's assertions that Plaintiffs had breached the Merger Agreement's representations and warranties.[6]

---

[6] For example, C3 stated that "the circumstances supporting" its belief that the "Software Defects" warranty had been breached "include[d], among other facts" that C3 had identified "over 200 defects in [E2.0's] Software." PTX-64.00002. In discovery, C3 claimed that spreadsheets produced from Jira, a project tracking software program, identified the "over 200 defects" that C3 allegedly had found in E2.0's software. DTX-626.035-36 ¶¶ 88-89 (Fenn Report); Tr. 1774:7–12 (Fenn); Tr. 2127:3–18, 2163:9–25 (Behzadi). But the Jira spreadsheets actually identified defects in C3's own software products, not E2.0's software. Tr. 1699:1–8, 1702:24–1703:15, 1708:23–1710:9 (Fenn); Tr. 2164:12–22; Tr. 2170:12–14 (Behzadi) (referencing DTX-443 (Jira Export)). C3's expert, Dr. Douglas Schmidt, testified that, using a word search for "fix" as a proxy for defects, he had uncovered 359 defects in the "git log" for E2.0's software. Tr. 2300:9-2301:6 (Schmidt). Most of the instances of "fix," however, were changes made before the merger, id., and not all the "fixes" were material defects. (Some "defects" were to "fix misspelling[s]," for example. Tr. 2302:3–2303:23.) In any event, Dr. Schmidt's analysis of the git log did not exist at the time of C3's Notice of Indemnification Claim, as Schmidt undertook his analysis after September 21, 2018—approximately five years after the indemnification notice was sent to Plaintiffs. Tr. 2285:11–20. Defendants adduced no evidence that suggested C3 possessed any list of defects in E2.0's software at the time it sent the Notice of Indemnification Claim.

## CONCLUSIONS OF LAW

Plaintiffs' first two claims for relief are for securities and common law fraud. The parties agree that the elements for these claims overlap and that to prevail on these claims Plaintiffs must prove by a preponderance of the evidence that (1) Defendants made a material misrepresentation; (2) Defendants acted with "scienter," i.e., an intent to defraud; (3) Plaintiffs reasonably or justifiably relied on the alleged misrepresentation; (4) Plaintiffs suffered economic loss; and (5) Defendants' misrepresentation proximately caused Plaintiffs' economic loss. *See* D.I. 374 at 29–30; D.I. 373 at 52; *see also McCabe v. Ernst & Young LLP*, 494 F.3d 418, 424 (3d Cir. 2007); *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005); *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 816 (Del. Ch. 2014).

Plaintiffs third claim for relief is for breach of contract by C3. In the two operative pleadings (the Second Amended Complaint (D.I. 190) and Plaintiffs' Answer and Counterclaims (D.I. 120)), Plaintiffs alleged that Defendants breached the holdback and earnout provisions of the Merger Agreement. At the close of trial, Plaintiffs asked to amend their breach of contract claim to allege that Defendants breached the Merger Agreement by failing to issue to Plaintiffs at the closing of the merger C3 shares individually worth $3.33. D.I. 372 at 44; Tr. 2594:4–99:13.

The parties agree that Delaware law governs Plaintiffs' contract claim. D.I. 374 at 45; D.I. 360, Ex. 3 at 34. Under Delaware law, the elements of a contract claim are: (1) a contractual obligation; (2) breach of that obligation by the defendant; and (3) resulting damage to the plaintiff. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

## I. Section 10(b) and Common Law Fraud Claims

Plaintiffs' securities and common law fraud claims fail because, as I found above, Plaintiffs did not adduce at trial proof by a preponderance of the evidence that Defendants made a material false representation. I also find that, even if a misrepresentation had been made during the discussions that led to the merger, Defendants did not act with the requisite scienter to support a fraud claim. The record evidence in my view clearly established that Defendants were transparent with Plaintiffs throughout the merger negotiations. *See Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) (stating that "transparency" in conducting a transaction "negates the inference of scienter"); *S.E.C. v. Shanahan*, 646 F.3d 536, 545 (8th Cir. 2011) ("This transparency is not the behavior one would expect from an intentional or severely reckless violator of the securities laws."). Defendants provided Plaintiffs with all the third-party valuations C3 had in its possession, as well as C3's historical financial data and customer contracts. I think it evident from the credible testimony of Siebel, Schmaier, and Scaramellino and from the

emails and internal memoranda contemporaneous with the merger negotiations that C3 was honest and forthcoming in its dealings with E2.0.

## II. Breach of Contract Claim

### A. Alleged Breach Based on Dollar Value of Up-Front Shares

Approximately an hour into his closing argument at trial, Plaintiffs' counsel announced for the first time that Plaintiffs wanted to amend the operative pleadings. Counsel argued:

> The amount we received was represented in the contract to be X number of shares with this $3.33 unit divisor that resulted in a number that was reflected, a dollar amount. Units equal to. If you look at the bottom of the first page of the agreement, it says, you shall get the number of parent units equal to, and then it talks about the estimated up front amount is a dollar amount . . . .
>
> And what we're saying is we didn't get the number of parent units equal to the true value, the true estimated amount, which, rather than $3.33, was actually $1.72.[7] And so our damages are the ten-and-a-half million dollars that you saw that we were supposed to get. We only got 5.4 million, and so the difference between those two numbers are our contract damages for getting shorted at the closing. . . .
> And I go back to [Federal] Rule [of Civil Procedure] 15, which says, a party may move at any time [to amend pleadings,] even after judgment.

---

[7] Plaintiff's expert, Kenneth Paul Metcalf, testified at trial that in his opinion C3 was worth $257 million at the time of the merger and therefore C3's shares were individually worth $1.72 as of that date. Tr. 1812:13–15.

Tr. 2597:5–24. When I asked counsel, "What are you seeking to amend?" he replied, "The fraud claim to a breach of contract claim on the up-front amount." Tr. 2594:18–20. One might infer from that response that Plaintiffs were abandoning their fraud claims. I have not made that conclusion, logical as it may be based on counsel's words. I will, however, deny Plaintiffs' motion to amend because amendment would be futile. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3 1410, 1434 (3d Cir. 1997) ("Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." (citations omitted)). Plaintiffs' proposed amendment is futile because, as explained above, the $3.33 Unit Divisor in the Merger Agreement was not a representation of C3's value; and thus, contrary to Plaintiffs' arguments, there was no contractual obligation on C3's part to issue to Plaintiffs at the merger's closing C3 shares that were individually worth the equivalent of $3.33 in cash.

### B. Alleged Breach of the Agreement's Earnout Provisions

Plaintiffs allege that C3 breached § 1.4(a)(vii) of the Merger Agreement, which prohibited C3 from "tak[ing] any action in bad faith whose purpose is to intentionally minimize or intentionally interfere with the achievement of any Earnout Event." As Plaintiffs acknowledged in their post-trial briefing, this claim "turns on the question of bad faith." D.I. 374. I have already found that, as a factual matter, C3 did not take bad faith actions that intentionally minimized or

46

interfered with the E2.0 Business Unit's ability to achieve the revenue and profit targets that were necessary for the Earnout Events. Accordingly, C3 did not breach the contractual obligations it owed to Plaintiffs under § 1.4(a)(vii).

## C. Alleged Breach of The Agreement's Holdback Provisions

Before addressing the merits of Plaintiffs' holdback-based contract claim, two disputed threshold issues require resolution: whether Plaintiffs have standing to bring the claim and who bears the burden to prove whether Defendants' non-issuance of the Holdback Units violated the terms of the Merger Agreement.

### 1. Plaintiffs' Standing

Citing § 6.5(c) of the Merger Agreement, Defendants argue that "Plaintiffs lack standing to assert a breach of contract claim regarding the Holdback Units, because only the Securityholder Representative (as defined by the Merger Agreement) has standing to initiate such a claim." D.I. 373 at 85. It is undisputed that none of the Plaintiffs are the Securityholder Representative, which was expressly defined in the Agreement to be Scaramellino. *See* PTX-1.00001; DTX-670.6. Section 6.5(c), however, does not preclude the Plaintiffs from bringing a breach of contract claim. Although § 6.5(c) provides that "the Securityholder Representative *may* submit the contested portion of [an] indemnification claim to the Delaware Courts," PTX-1.00036 § 6.5(c) (emphasis added), it does not preclude an E.20 Unitholder from filing its own law suit. As third-party

beneficiaries of the Merger Agreement, Plaintiffs have standing to bring a breach of contract claim based on C3's alleged failure to comply with the Agreement's holdback provisions. *Comrie v. Enterasys Networks, Inc.*, 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004) ("third-party beneficiaries have an enforceable right under contracts conferring a benefit to them, even though they are not parties to those contracts" (citations omitted)).

## 2. Burden of Proof

"There are no hard-and-fast standards governing the allocation of the burden of proof in every situation. This issue, rather is merely a question of policy and fairness based on experience in different situations." *Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 209 (1973) (internal quotation marks and citation omitted). In some instances, "the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or exemptions." *Schaffer v. Weast*, 546 U.S. 49, 57 (2005) (citation omitted); *accord* 2 J. Strong, McCormick on Evidence § 337, 412–15 (5th ed. 1999). "Under some [rare] circumstances th[e] Court has even placed the burden of persuasion over an entire claim on the defendant." *Schaffer*, 546 U.S. at 57 (citation omitted).

Defendants' justification for not issuing the Holdback Units is akin to a recoupment claim—i.e., an assertion of "[t]he right of a defendant to have the

48

plaintiff's claim reduced or eliminated because of the plaintiff's breach of contract or duty in the same transaction." Black's Law Dictionary 1528 (11th ed. 2019). Delaware courts long ago recognized that the defendant bears the burden of proof in such cases. *See, e.g., E.F. Houghton & Co. v. Alpha Process Co.*, 93 A. 669, 670 (Del. Super. Ct. 1915). As a policy matter, this rule makes sense. When a party claims the right to hold property as recompense for another's breach, the fact that the party wears a defendant's hat should not relieve it of the burden that would ordinarily accompany that type of claim. *Cf. Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 822 (Del. 2013) (affirming the Court of Chancery's "holding that the Defendants had failed to establish a breach of any representations or warranties in the Merger Agreement"). Accordingly, I conclude that C3 bears the burden of establishing that its non-issuance of the Holdback Units complied with the requirements of § 1.2(e) of the Merger Agreement.

### 3. The Merits of The Holdback-based Contract Claim

As noted above, Section 1.2(e) of the Agreement required C3 to issue to each E2.0 Unitholder within 18 months of the merger's closing date that unitholder's pro rata percentage of the Holdback Units unless C3 had "given a Notice of Indemnification Claim containing an indemnification claim which has not been resolved." PTX-1.00002 §1.2(e). Under § 6.5(a) of the Agreement, any Notice of Indemnification Claim was required to contain "a good faith, non-

binding, preliminary estimate of the aggregate dollar amount of Damages that have arisen or reasonably may arise as a result of the inaccuracy, breach or other matter referred to in such notice." PTX-100035 §6.5(a). I have already found as a factual matter that C3's assertion of the $4.45 million Claim Amount did not constitute a good faith preliminary estimate of the alleged damages it claimed to have suffered because of Plaintiffs' alleged breaches of the Merger Agreement's representations and warranties. Accordingly, C3 breached its contractual obligations under the holdback provisions of the Merger Agreement.

Plaintiffs, however, cannot prevail on their holdback-based contract claim because they failed to prove any resultant damages. Plaintiffs offered *no* evidence at trial to establish the value of the Holdback Units they were due as of the date C3 should have issued the Holdback Units (i.e., within 18 months of the effective date of the merger). Moreover, Plaintiffs did not ask for specific performance (i.e., delivery of the issued Holdback Units) or any other form of equitable relief in their Second Amended Complaint, and they insisted at trial that the only remedy they were seeking (and would accept) was money damages.[8] Because Plaintiffs did not

---

[8] During closing arguments, I pressed Plaintiffs' counsel on this very issue. Tr. 2551:4–10 (THE COURT: But what I'm getting at is, let's say I ruled in your favor. All right? What's going to happen? Aren't you going to be handed, aren't you going to be just tendered units, shares? MR. RABER: No. *We are suing for damages. We're not suing for, you know, any kind of equitable relief. We're suing for damages.*" (emphasis added)).

offer any evidence about what those money damages might be, their contract claim fails as a matter of law. *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) ("[W]hen acting as the fact finder, th[e] Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages." (citation omitted)).

## III. Fees and Costs

Section 7.3 of the Merger Agreement provides that if "any Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement is brought against any party hereto, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing party is entitled)." PTX-1.00038 §7.3. Because Defendants prevailed on all claims, Defendants are entitled to fees and costs. *See id.*

## CONCLUSION

For the foregoing reasons, I will deny Plaintiffs' oral motion to amend their pleadings and find in favor of Defendants on all three claims for relief alleged in Plaintiffs' Second Amended Complaint (D.I. 190) and Answer and Counterclaims (D.I. 120). I will also award Defendants their reasonable attorneys' fees, costs, and disbursements.

The Court will issue an Order consistent with this Memorandum Opinion.